514 So.2d 257 (1987)
STATE of Louisiana
v.
Judith WALTERS a/k/a Judith Stevison.
Nos. 87-KA-293, 87-KA-294.
Court of Appeal of Louisiana, Fifth Circuit.
October 14, 1987.
Rehearing Denied November 17, 1987.
*259 Patrick Fanning, New Orleans, for defendant-appellant.
Thomas Daley, Robert Levenstein, Asst. Dist. Attys., Edgard, for plaintiff-appellee.
Before DUFRESNE, WICKER and GOTHARD, JJ.
WICKER, Judge.
Judith Walters was indicted for and tried on two counts of first degree murder. A jury convicted her and sentenced her to life imprisonment on both counts. Walters specifies four errors which she claims warrant reversal: the trial judge's denial of several motions for change of venue, the trial judge's denial of a mistrial based upon allegedly prejudicial evidence, the trial judge's admission of evidence of other crimes, and the trial judge's admission into evidence of a tape-recorded statement of a witness. We affirm.
Walters' lengthy statement to law enforcement officers forms the basis for the following factual account.
Walters, her 14-year old daughter, Sheila, and John Willie,[1] left Florida heading west in Walters' car on Interstate 10 on June 1, 1985, around 10 P.M. Sheila was suffering from bronchitis and was asleep on the back seat. At one point, they stopped at a liquor store and bought a fifth each of tequila and Southern Comfort.
In Slidell, Willie spotted an acquaintance, Billy Phillips, hitchhiking on a west-bound roadway; and Walters and Willie picked him up. Walters heard the two men talking about another acquaintance in common, Mary. Willie had once lived with Mary, and Phillips had at times had sexual intercourse with Mary's ten-year-old daughter. They decided to head for Gretna, Louisiana to find Mary and her daughter.
Walters, the men, and Sheila arrived at an apartment complex in Terrytown around 4 P.M. the following day. Willie and Phillips got out of the car and headed into the complex in the direction of a playground and pool area while Walters remained in the car. Sheila, needing to use the bathroom, headed after them. Walters stayed in the car until Willie returned without Sheila, and Walters became concerned about Sheila's whereabouts. Willie, Phillips, and Sheila soon returned to the car, with Sheila leading eight-year-old N. by the hand.
Walters returned to the front seat, with Willie driving; and Phillips, Sheila, and N. got in the back seat with N. in the middle. They continued riding around, crossing the Huey P. Long Bridge and heading toward LaPlace. Phillips began putting his hands on N. and forcing her to sit on his lap, and N. began to scream and cry. Willie then hit her.
Walters became aware that "something bad was going to happen."
I was wanting to take her somewhere and put her out and take her back where they got her or take her where she was going or just get her out of the car I just I had a feeling something was going to happen and John told me that she belonged to Billie [Phillips].
. . . .
The way John said it I was afraid that ah he was planning on doing something to this little girl it was, it wouldn't he didn't say it like it would have been his daughter or a kin to him or anything like that it was kind of hateful they way John said that she belonged to Billie....
. . . .
I knew then something bad was going to happen and it was going to be with that little girl....
. . . .
I knew then in my mind what was gonna happen. I didn't know anybody was gonna get killed, but I knew that that guy in the back seat was gonna do something to that little girl and John wasn't doing anything to help ...
During the period of time following her first knowledge that "something bad was *260 gonna happen" until the events leading to the deaths of N. and Phillips, Walters had three opportunities to remove herself and Sheila, and perhaps N. as well, from the situation.
Walters and the others stopped at Louisiana Power and Light on Jefferson Highway; and Walters, Sheila and N. were all out of the car at one point. N. got upset and was crying. "... John [Willie] had got back in the car and he got in the front and Sheila she stayed standing outside where she was and they were talking when ah I took the little girl and walked off." Willie got upset with Walters because she was talking with N., and he slapped Walters. Everyone got back into the car and started up again, driving through Harahan to River Road, while Sheila calmed N. down. Phillips continued touching and hurting N. They stopped once again at the Little Gypsy power plant on River Road; and Walters, Sheila, and N. got out again. Then they all got back in the car and went on to LaPlace, where they stopped once more at the Exxon Station at the intersection of Interstate 10 and Interstate 51.[2] N. began crying again and Walters, Sheila, Willie, and N. got out of the car to use the bathroom.
When they started driving again, Walters, Sheila and Willie shared the front seat leaving Phillips "messing with" N. in the back seat. Phillips continued to abuse N. Walters and the others stopped again in a wooded area alongside the interstate, and Walters and Sheila got out. Then Willie and Sheila returned to the car and drove off, leaving Walters alone. They returned an hour or so later with Sheila's mouth bloodied and N. covered with blood. They parked and Walters got back in the car. Willie and Phillips shared the back seat with N., abusing her sexually and physically.
Phillips raped the little girl, while Willie at the other end forced his penis into her mouth. Walters was also in the back seat, on the floor, and had Willie's penis in her mouth at one point. She remained with her face touching N.'s throughout, and Willie ejaculated on Walters' and N.'s faces. Willie then changed places with Phillips, raping N., while Phillips put his penis in N.'s mouth. Walters then took Phillips' penis in her mouth. Willie experienced difficulty in raping N.; and in his anger he punched her face, broke her leg, and strangled her to death. Willie then turned N. over on her stomach and raped her anally while kissing Walters. During this, Phillips came around behind Willie and had anal intercourse with him. Walters became concerned that people passing by might see what was going on.
They all drove off again, with Willie driving, Walters and Sheila in the front seat, and Phillips in the back seat with N.'s body.
Phillips then admitted to having had sex with Sheila earlier, and Willie became angry with Phillips. Willie put Phillips out at the side of the road and drove off. Willie then turned around and ejected Walters from the car as well.
Walters and Phillips walked around the woods and down the road until Willie came back. Walters and Willie sat on the ground on their sleeping bag in the woods talking about N. "I didn't know what he intended to do with this little girl. But I had I-I-I just knew he was gonna put her out somewhere around there. Cause I mean you just couldn't go driving around town with ah dead people in your car."
Walters and Willie started having sex, and they noticed Phillips standing there watching. Phillips walked away and came back with N.'s body. He put it on the sleeping bag next to Walters and Willie and began having sexual intercourse with the body. Walters, along with Willie, watched this; and Walters described N.'s face: "Her her face was just it was just completely out of-it didn't look like a face. Part of it was like it was tore or you could see the bone." Phillips then dragged N.'s body back to the car.
*261 Walters and Willie quarelled. Phillips returned from the car and saw Walters and Willie fighting. Phillips joined in, and Willie stabbed him. Walters sat on the ground next to Willie and watched him stab Phillips repeatedly and mutilate the body by cutting off the genitals. Ultimately, Walters began stabbing Phillips also, for a total of eighty-two stab wounds in the body. Willie then sawed off Phillips' hand. Walters zipped up Phillips' body into the sleeping bag, with Willie's assistance. They each picked up an end of the bag and carried Phillips' body back to the car and put it into the back seat where N.'s body was.
They got back into the car with Sheila and drove off. Walters and Willie dropped Phillips' body into the water from a bridge and put the sleeping bag back in the trunk. They got back in the car and drove on a little ways before stopping again. Walters and Willie went back into the woods with N.'s body. Walters lay across the body and watched while Willie raped the body, and they left it behind in the woods and drove off with Sheila still in the car.
On the drive back to the New Orleans area, Walters tossed a package of clothes and shoes out the car window. They all then stopped for fried chicken in Kenner, Louisiana, before returning to Florida. Willie apparently switched around the contents of the bags of food, since when Walters opened her bag, she was confronted with bloody objects instead of the fried chicken she expected.[3]
The heinous facts were taken from Walters' own statement to law enforcement officials, and a tape recording of this statement was played to the jury. Her defense to the crimes was that of innocent bystander: "... if I if I thought I could have done something (pause) I would have. I tried (pause), but when it came down to it, I, I couldn't do anything (pause). It just wasn't, I just couldn't do it." She also alleged that Willie struck and/or punched her repeatedly during the commission of these crimes, apparently to excuse her presence and participation.
However, the cashier who waited on Walters and Willie in the fried chicken restaurant noted no signs of abuse, scars, or bruises on Walters' face immediately following these crimes. Another witness' testimony also disproves Walters' allegations that she was a helpless bystander. Jane Wells, the woman with whom Walters, Willie and Sheila had been living in Florida shortly before and after these murders were committed,[4] testified that Walters and Willie held themselves out as being married and were loving and kissing the whole time they lived with her and her husband although there were also jealous arguments. The day after Walters and the others returned from their activities in the LaPlace area, Walters, working alone, scrubbed her car, including the back seat which she had removed, with Brillo pads. This activity took an entire day. Walters also scrubbed the sleeping bag. When Wells later asked what had happened to the sleeping bag, Walters told her they had hocked it. Willie did not participate in any of this scrubbing activity. Most importantly, Wells also testified that, on their return, neither Sheila nor Walters were bruised.
Fred McFaul, an F.B.I. agent who participated in the investigation of these crimes, also testified. Over the objection of defense counsel, he gave evidence of Walters' statement concerning her and Willie's involvement about six weeks later in another crime.[5] They were driving in Florida, picked up a male hitchhiker, and Willie and the hitchhiker went into the woods together. Walters walked over to them and watched Willie and the hitchhiker engage in anal intercourse. Willie killed the hitchhiker with a hammer and had anal intercourse with the dead body. Then Walters had sexual intercourse with the body. They had sexual intercourse with each other, *262 lying on the body. Walters and Willie carried the body out to the highway, and they ran over it with the car.
Law enforcement attention first focused on this and one other Florida murder. In the course of interrogating Walters about them, evidence of the N. and Phillips killings came to light; and the Florida authorities contacted Louisiana law enforcement officials. Walters talked to F.B.I. agents and state officers over a period of several weeks, and these talks resulted in the tape-recorded statement used in evidence against Walters.
Walters was indicted for first degree murder (L.S.A.-R.S. 14:30) of N. and second degree murder (L.S.A.-R.S. 14:30.1) of Phillips. A superseding indictment raised the second charge to first degree murder [(L.S.A.-R.S. 14:30(A)(3)]. Walters pleaded not guilty and was brought to trial in the parish of St. John the Baptist.
Walters moved for a change of venue, alleging that it would be impossible to pick an impartial jury due to the pre-trial publicity. The trial judge ordered the selection of a mock jury in order to determine whether or not the venire had been corrupted by the pre-trial publicity. Eleven of the mock jurors concluded that their exposure to publicity would not affect their ability as jurors; one knew nothing at all about the crime. The trial judge denied the motion for change of venue, finding "... no evidence of the jury being overly influenced...."
Walters moved for a change of venue a second time, after Willie's trial; and the trial judge again denied the motion. Walters took writs to this court (No. 86-K-778). We ordered that the trial judge's ruling on change of venue be set aside and a decision on the matter deferred until after voir dire was complete. The trial judge once again denied the change of venue following voir dire on the first day of trial.
ASSIGNMENT OF ERROR # 1
Walters alleges that
THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION when it denied defendant's several motions for change of venue, renewed following the voir dire examination of the jurors at the trial of this cause, when there was a saturation of the community with publicity of this notorious case, especially when defendant's alleged accomplice, John Willie, had been tried, convicted and sentenced to death only a few weeks before the commencement of defendant's trial.
During the one-day jury selection process, dozens of prospective jurors were questioned extensively by the trial judge and both counsel. The inquiry focused on several issues: whether or not the juror could disregard and put aside any impressions left by newspaper, radio, and/or television coverage; whether the juror could impose the death penalty if warranted by the evidence; whether the juror could assign equal weight to law officer testimony as to civilian testimony; whether the juror could understand and accept the law of principals; whether the juror could accept the proposition that presence at the scene of the crime and failure to intervene was not sufficient to constitute guilt; whether the juror felt that intoxication should tend to excuse criminal behavior; whether the heinous nature of the crimes in question would cause the juror to be more likely to find guilt than otherwise; and whether the juror could understand and accept the state's burden of proof beyond a reasonable doubt. Twenty-eight prospective jurors were challenged and excused for cause. Walters and the prosecution exercised only four and two, respectively, of their peremptory challenges.
L.S.A.-C.Cr.P. art. 622 provides that
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
*263 The Louisiana Supreme Court has held that "the trial judge must consider if prejudice, undue influence, or any other reason will deny the defendant a fair trial in the parish in which the prosecution is pending." State v. Clark, 442 So.2d 1129, 1132 (La.1983). Furthermore,
If the defendant can demonstrate that actual prejudice, influence, or other reasons exist which will affect the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial, the court must take this into consideration in deciding whether to grant a change of venue.... Moreover, although extensive knowledge in the community of either the crimes or the accused and his prior crimes is not in itself sufficient to render a trial constitutionally unfair, unfairness of a constitutional magnitude may be presumed so as to require a change of venue if the "trial atmosphere" has been "utterly corrupted by press coverage." (Citations omitted.)
State v. Clark, supra at p. 1134. State v. Brown, 496 So.2d 261, 263 (La.1986) lists the factors to be considered in making this determination.
(1) the nature of pretrial publicity and the particular degree to which it has circulated in the community,
(2) the connection of government officials with the release of the publicity,
(3) the length of time between the dissemination of the publicity and the trial,
(4) the severity and notoriety of the offense,
(5) the area from which the jury is to be drawn,
(6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and
(7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
An earlier formulation was given in State v. Berry, 329 So.2d 728, 730 (La.1976).
Other factors ... include the degree to which the publicity has circulated in areas to which venue could be changed, the care exercised and the ease encountered in the selection of the jury, the familiarity with the publicity complained of and the resultant effect, if any, upon the prospective jurors or the trial jurors, and the peremptory challenges and challenges for cause exercised by the defendant in the selection of a jury.
Walters had the burden of proving entitlement to a venue change. State v. Clark, supra. In comparing the record of her case with the standards set out above, we find that she has not met that burden of proof.
Walters made no showing of either the nature or the degree of pre-trial publicity connected with her case. Her only evidence was the statement of prospective jurors that they had either read or heard about the case. Walters showed no connection between government officials and the publicity in question. She introduced no evidence of the length of time between her trial and the publicity complained of. The prospective jurors were drawn from a parish which had neither a daily newspaper or a television station of its own. There was no evidence which called into question either the candor or veracity of the prospective jurors. Walters failed to prove there were other parishes in which she could be tried which were ignorant of any pre-trial publicity. The record shows meticulous care exercised and no particular difficulty with jury selection. The record also shows that all the jurors selected, as well as many excused for reasons unconnected with preconceived opinions as to guilt, were clear in their belief that they would be unaffected by any pre-trial publicity to which they had been exposed. Walters had used only four of her peremptory challenges.
Only two factors might apply. Walters' crime was an especially heinous one; and Willie had been tried, convicted, and sentenced to death for first degree murder shortly before Walters' trial. However, the few jurors who expressed doubt about their ability to put aside their revulsion and consider the evidence without regard to what they had read or heard about the case were excused.
*264 We have nothing before us but the bare assertions of Walters' counsel that the trial atmosphere was corrupted by publicity, along with the transcript of the voir dire. Every juror ultimately chosen clearly and unequivocally stated that he or she could put aside any preconceptions concerning Walters' guilt and give her a fair trial. Of those jurors who were excused, only a minority claimed to have been affected by the newspapers, radio, and television stories.
Qualified jurors need not ... be totally ignorant of the facts and issues involved. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (Citations omitted.)
Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975). Accord: State v. Morris, 429 So.2d 111 (La.1983).
The cases in which a change of venue has been granted are clearly distinguishable. In State v. Clark, supra, counsel for the defense introduced television scripts, newspaper articles, video-tapes of television programs, and the testimony of a psychologist and news professionals. The defense in State v. Brown, supra, used the testimony of media representatives and an expert in public opinion. No television scripts, articles, video-tapes, or expert testimony were introduced in the instant case.
The language of the United States Supreme Court, in Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977) is clearly applicable.
Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected.... Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere ... utterly corrupted by press coverage".... One who is reasonably suspected of murdering his children cannot expect to remain anonymous. (Citations omitted.)
Walters also complains that the trial judge refused to allow sequestration of the prospective jurors and individual voir dire, rather choosing to call the jurors in small groups. This is a matter, however, which is within the discretion of the trial judge.
No provision in our law either prohibits or requires the sequestration of prospective jurors for an individual voir dire. In general, details as to whether the potential jurors should be called singly or by groups are left to the trial court's discretion.... Unless there is a significant possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material, there is no requirement that the examination of each juror must be conducted individually. (Citations omitted.)
State v. David, 425 So.2d 1241, 1247 (La. 1983), cert. den. David v. Louisiana, ___ U.S. ___, 106 S.Ct. 1998, 90 L.Ed.2d 728 (1986).
The decision to grant or deny a change of venue rests with the discretion of the trial court. L.S.A.-C.Cr.P. art. 784. This discretion will not be overturned without a showing of error or abuse of discretion. State v. Vaccaro, 411 So.2d 415 (La. 1982); State v. Berry, supra. We find neither error nor abuse of discretion on the part of the trial judge and decline to disturb his ruling on this issue. This assignment of error has no merit.
ASSIGNMENT OF ERROR # 2
Walters complains that
THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION when it denied *265 defendant's motion for a mistrial based upon prejudicial evidence of other criminal acts and when, over objection by defendant that an admonishment to the jury to disregard the testimony that the defendant and John Willie had returned to Louisiana for the purpose of killing defendant's husband, not only failed to admonish the jury to disregard such illegal evidence but repeated it and other prejudicial testimony by the witness and imprinted both items of prejudicial evidence upon the minds of the jury much more than it would have been had the testimony not been repeated by the Court.
Counsel for Walters and the prosecution had agreed that expected testimony of other murders would be brought to Walters' attention first so that the issue of admissibility could be dealt with outside the presence of the jury. The agreement was qualified, however, by the prosecution's statement that he would not automatically be able to control statements from witnesses. The trial judge refused a request by Walters' counsel to instruct the prosecutor not to mention the other murders, stating, "I can't control a spontaneous statement by a witness...."
F.B.I. Agent Victor Harvey, testifying about his first contact with Walters (the first of many such interviews), stated that Walters had told him "they [Walters and Willie] had decided to kill Vondell Walters [Walters' husband] and traveled back to Norco to take care of Vondell." Walters then moved for a mistrial, alleging that admonishing the jury to disregard this testimony was insufficient to cure the prejudice to her. The trial judge denied the motion and admonished the jury
to disregard, if they heard or remember, anything with reference to the defendant, Judith Walters, knowing of any particularly brutal murders committed by John Willie. You are to disregard that statement. It is not to enter your deliberation and unless it is supported by evidence in the future. Also, as to the comments, it is the ruling of The Court that this is inadmissible at this time that they came to Louisiana for the purpose of murdering anyone.
L.S.A.-C.Cr.P. art. 770 mandates a mistrial only when a judge, district attorney, or other court official refers to "another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible." However, a police officer such as Harvey is not a "court official" for purposes of L.S.A.-C. Cr.P. art. 770. State v. Watson, 449 So.2d 1321 (La.1984), cert. den. Watson v. Louisiana, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985).
Where the remark is made by someone other than the judge, district attorney, or other court official, such as is the case here, then the proper remedy is outlined in L.S.A.-C.Cr.P. art. 771.
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial ... when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
. . . .
(2) When the remark or comment is made by a witness or person other than the judge, district attorney or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Thus, it is within the proper discretion of the trial judge to choose a remedy in this case. A mistrial should be granted only where substantial prejudice would deprive Walters of a fair trial. State v. Tribbet, 415 So.2d 182 (La.1982). Even where the objectionable remark has been made by a police officer and requires closer scrutiny, the choice between mistrial and admonition rests with the trial judge. State v. Nuccio, 454 So.2d 93 (La.1984). We find no abuse of his discretion in refusing to grant the *266 mistrial requested by Walters. This assignment of error has no merit.
ASSIGNMENT OF ERROR # 3
Walters argues that
THE TRIAL COURT ERRED when it admitted evidence of other alleged crimes involving John Willie and defendant, such acts having occurred subsequent to the acts charged in the indictment, especially since the Court failed to appropriately instruct the jury prior to the adducement of such evidence of the limited use to which such evidence could be put by the jurors in deciding defendant's guilt of the offenses charged.
The prosecution introduced evidence, through the testimony of F.B.I. Agent Fred McFaul, of the Powe murder. In urging its admissibility to the trial judge prior to the testimony, the prosecution argued that such evidence of a prior crime was admissible to show intent, knowledge, or system. L.S.A.-R.S. 15:445 and 446. Walters argued that this evidence showed only her presence but not her participation in this murder.
In general evidence of other crimes committed by the defendant is not admissible, especially where the prosecution is seeking to show that the defendant is a "bad person" inclined to criminal acts, since the defendant's character is not an issue unless he or she chooses to make it an issue. State v. Prieur, 277 So.2d 126 (La.1973). Nevertheless there are exceptions to this rule where the other crimes are similar and are relevant to show intent, knowledge, or system. State v. Prieur, supra.
Walters' defense rests on a claim that she was an unwilling, even forced, bystander in the murders of N. and Phillips. Her attorney argued that Walters was present and helpless to do anything, and that she did not participate but was merely a witness. Consequently, her intent and knowledge vis-a-vis these crimes are certainly issues.
L.S.A.-R.S. 15:445 reads
In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction.
Three requirements must be met in order that evidence of other crimes be allowed as proof of intent: the prior acts must be similar, there must be a real and genuine contested issue of intent, and the probative value of the evidence must outweigh its prejudicial effect. State v. Kahey, 436 So.2d 475 (La.1983). The "prior" acts referred to, however, may actually be acts subsequent to the crime being tried. State v. Germain, 433 So.2d 110 (La.1983). We hold that the evidence of other crimes comports with these requirements.
In both the Powe murder and the N. and Phillips murders, the victims were abducted; they were taken by automobile to wooded areas; there was sexual activity with the victims; the victims were killed; there was sexual activity with the dead bodies; and the bodies were disposed of. Walters' intent with regard to her presence at the murders of N. and Phillips was an issue, as first degree murder is a crime which requires specific intent. L.S.A.-R.S. 14:30. Presence and participation at the later Powe murder certainly have a bearing on Walters' innocent explanation of her presence and participation at the earlier killings. The probative value of this evidence, to show Walters' continuing association and participation with Willie as it relates to intent, certainly outweighs its concededly prejudicial effect. Furthermore, the trial judge instructed the jury with regard to the limited purpose of this evidence. State v. Ghoram, 290 So.2d 850 (La.1974). This assignment of error has no merit.
ASSIGNMENT OF ERROR # 4
Walters alleges that
THE TRIAL COURT ERRED when it admitted a tape recorded interview of defendant's daughter, who was not present at the trial but who was served an out-of-state subpoena to appear two days after the conclusion of the evidence *267 and one day after the jury's verdict, when it was not suggested that the defense procured the said witness' absence and the defendant had no prior opportunity to cross-examine the witness when she made the statement to law enforcement officers which was admitted against her on the trial of this case.
During their investigation of this case, law enforcement officials questioned Sheila at great length, always in the presence of her grandmother.[6] The officers tape-recorded a lengthy statement by Sheila, summarizing the facts gleaned over this period of interviews. There is no question that the statement was voluntarily and knowingly given. However, the statement was not sworn and neither Walters nor her attorney was present to cross-examine Sheila.
The prosecution, through an order by a Mississippi judge,[7] subpoenaed Sheila to testify at the trial. The trial went more quickly than expected and was concluding prior to the date on which Sheila was ordered to appear. The trial judge issued an attachment to be served on Sheila and her grandmother in Mississippi. When the Mississippi officials tried to serve the attachment, they found that Sheila and her grandmother had left their home in Laurel, Mississippi, allegedly advising family and employees not to reveal their location. The prosecution moved for a recess of the trial so that Sheila's presence could be obtained, but Walters' counsel opposed the recess. The trial judge denied the recess. The prosecution, then having no alternative, moved for the admission of Sheila's tape-recorded statement, which the trial judge allowed.
The trial judge reasoned that Sheila was a co-conspirator whose statement was an exception to the rule on inadmissibility of hearsay evidence. L.S.A.-R.S. 15:455. He further reasoned that the holding of U.S. v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), relieved the prosecution of the necessity of showing Sheila to be unavailable. This was error on the part of the trial judge, but we hold it was ultimately harmless error.
Hearsay statements of a co-conspirator are admissible only when "made in furtherance of the common enterprise and during its continuation." State v. Dupree, 377 So.2d 328, 330 (La.1979). Assuming Sheila was a co-conspirator and not an unknowing dupe of her mother and her mother's lover, which we seriously doubt, it is clear that her statement to law enforcement officials was not made during and in furtherance of the conspiracy. Statements which are made during interrogation and after the conspiracy has been abandoned do not fall within this exception to the hearsay rule. State v. Dupree, supra.
Hearsay statements can also be admissible under the unavailability exception. Transcribed testimony from a prior proceeding can be used, provided certain conditions are met. The Supreme Court, in State v. Oliver, 430 So.2d 650, 654 (La. 1983), cert. den. Oliver v. Louisiana, 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 688 (1983), outlined those conditions:
(1) [D]efendant must have been represented by counsel at the earlier hearing; (2) the witness testified under oath; (3) the witness was cross-examined or else there was a valid waiver of the right to cross-examination; (4) at the time of the trial, the witness (whether out of state or not) is unavailable or unable to testify; and (5) the state has made a good faith diligent effort to obtain the presence of the witness.... (Citations omitted.)
Several of the requisite conditions are not met: Walters was not represented by counsel when the statement was taken, Sheila was not under oath, and Walters had no opportunity to cross-examine Sheila. We must conclude that this exception does not apply.
Even inadmissible evidence, however, does not require reversal of a conviction if its admission is harmless. "A judgment or ruling shall not be reversed by an appellate court because of any error, defect, *268 irregularity, or variance which does not affect substantial rights of the accused." L.S.A.-C.Cr.P. art. 921. See also 28 U.S.C. 2111. Reversal is mandated only when the court is convinced beyond a reasonable doubt that the improperly admitted hearsay contributed to the verdict. State v. Banks, 439 So.2d 407 (La.1983). See also Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and State v. Gibson, 391 So.2d 421 (La.1980).
We find, under the circumstances of this case, that the admission of Sheila's tape recorded statement was harmless error which does not warrant reversal of Walters' conviction. The other evidence against Walters, especially her own statement, so overwhelmingly show guilt that we cannot find beyond a reasonable doubt that Sheila's statement contributed to the verdict. State v. Darby, 403 So.2d 44 (La. 1981), cert. den. Darby v. Louisiana, 454 U.S. 1152, 102 S.Ct. 1022, 71 L.Ed.2d 308 (1982). See also State v. Santee, 464 So.2d 922 (La.App. 4th Cir.1985) and State v. Prosper, 455 So.2d 673 (La.App. 4th Cir. 1984). Furthermore, Walters' own confession provided a sufficient evidentiary basis, especially when coupled with other admissible evidence, upon which to base a conviction. State v. Mitchell, 437 So.2d 264 (La. 1983).
That evidence, in review, consisted of the following: Walters had been living with Willie for some time before the crimes; Walters and Willie were always loving and kissing, even after the N. and Phillips murders; Walters headed for New Orleans with Willie; Walters was present in the car when Willie picked up Phillips; Walters heard Willie and Phillips discussing sexual intercourse with a ten-year-old girl; Walters remained in the car and drove off with these men who had abducted a child; Walters admitted that she knew something bad was going to happen to N.; Walters remained with Willie although she and Sheila had at least three opportunities to remove themselves from the situation; Walters had at least one opportunity to flee with N. at a time when they had all stopped to use the bathroom; Walters passed up these opportunities even though the abuse of N. had already begun; Walters remained in the car while N. was tormented, raped, and murdered; Walters had sexual intercourse with Willie shortly after N.'s murder; Walters repeatedly stabbed Phillips; Walters helped dispose of the bodies of Phillips and N.; Walters disposed of N.'s and Phillips' clothing and shoes; there was no visible, physical evidence that Walters had been slapped or punched during these events; Walters cleaned the car, especially the back seat, the day after N. and Phillips were murdered; Walters also scrubbed and apparently disposed of the sleeping bag used at the time of Phillips' murder; six weeks later, Walters was still with Willie when they picked up another hitchhiker, Powe; Walters had sexual intercourse with the dead body and with Willie immediately after the murder; and Walters helped dispose of this body.
Sheila's statement tends, understandably, to exculpate her mother and excuse her conduct as being a result of Willie's coercion. There, are also contradictions between Sheila's statement and Walters'. Nevertheless, it in large measure confirms much of what Walters had already admitted. That confirmation consists of the following evidence: Walters was in the car when Willie and Phillips were talking about a little girl; Sheila followed Willie and Phillips back to the car, leading N. by the hand; Walters remained in the car; N. started crying; Willie hit N. and made her scream; Walters, N. and Sheila got out to use the bathroom at Louisiana Power and Light; everyone got back into the car and started riding again; they stopped again in LaPlace; N. was still screaming and crying; Walters was present in the car when N. was raped and murdered; Walters and Willie had sexual intercourse after N.'s murder; Walters was present when Willie stabbed Phillips; Willie had sexual intercourse with Phillips' dead body; Walters and Willie brought the body back to the car wrapped in a sleeping bag; Willie had sexual intercourse with N.'s body; Walters, Willie and Sheila then stopped for fried chicken and Walters got a bag with something bloody in it. Sheila's statement was *269 merely corroborative of the other, admissible testimony introduced at trial. State v. Smith, 418 So.2d 515 (La.1982).
The admission of Sheila's statement was clearly error. However, after a careful review of the difficult issues raised, such as the overwhelming admissible evidence coupled with the corroborative nature of Sheila's statement, we are not convinced beyond a reasonable doubt that this hearsay evidence contributed to the verdict. We hold that the error complained of was harmless and decline to reverse Walters' conviction on this ground.
CONVICTION AND SENTENCE ON COUNTS ONE AND TWO AFFIRMED.
NOTES
[1] Walters and Willie had been living together. Willie was tried and convicted in separate proceedings for the murders of N. and Phillips.
[2] Walters' statement refers both to the Ecol station and the Exxon station, and it is not clear where they actually stopped.
[3] We assume these objects were Phillips' severed body parts.
[4] Wells and her husband had offered to let Willie, Walters, and Sheila share their trailer temporarily when they learned that the latter were living in a tent and that Sheila had been running fever of 104° and 106°.
[5] This is referred to as the "Powe murder."
[6] The grandmother is Walters' mother and Sheila's guardian.
[7] Sheila was a Mississippi resident.