587 So.2d 46 (1991)
STATE of Louisiana, Appellee,
v.
Frank Dwayne MOSELEY, Appellant.
No. 22,623-KA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1991.
Writ Denied November 22, 1991.
*48 Daryl Gold, Trial Counsel, Richard C. Goorley, Appellate Counsel, for appellant.
William J. Guste, Jr., Atty. Gen., James M. Bullers, Dist. Atty., for appellee.
Before MARVIN, SEXTON and VICTORY, JJ.
SEXTON, Judge.
The defendant, Frank Dwayne Moseley, was charged with second degree murder, a violation of LSA-R.S. 14:30.1. He was convicted as charged; eleven of the twelve jurors concurred in the verdict. Moseley was sentenced to the statutorily mandated penalty of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. On appeal, the defendant presents 19 assignments of error which, for ease of discussion, we group into seven arguments.[1] Finding none of the assignments of error have merit, we affirm the defendant's conviction and sentence.

FACTS
The murder of Bramonte "Monty" Smith by the defendant and Bryan Wayne Widenhouse,[2] all age 17 at the time, occurred *49 during the course of a Bossier Parish Sheriff's Department investigation into a theft and burglary ring which allegedly included Smith, Moseley, Widenhouse, and others. Smith, cooperating with law enforcement officials, agreed to wear a hidden radio transmitter. On August 14, 1989, Smith, being monitored by law enforcement officials through the transmitter, went to the residence of Moseley, where Widenhouse also lived,[3] in an attempt to recover a stolen assault rifle. Moseley and Widenhouse informed Smith that the assault rifle had been hidden in the woods. They told Smith to return the next day and the three would retrieve it together.
The following day, August 15, 1989, Smith, again fitted with a hidden radio transmitter, returned to the Moseley and Widenhouse residence. Bossier Parish Sheriff's Detective Charles Cook monitored the brief conversation at the residence and then, in an unmarked car, followed the three when they left the residence in a silver Camaro. Detective Cook followed the Camaro into rural Bossier Parish, but lost sight of and radio contact with the three when the Camaro unexpectedly turned around and passed Detective Cook going in the opposite direction. Detective Cook radioed for assistance and began a search for the vehicle.
Approximately an hour and a half later, the Camaro was stopped by Bossier Parish Sheriff's patrol deputy Charles Netherland. At that time, only Moseley and Widenhouse were in the vehicle. Deputy Netherland advised Moseley and Widenhouse of their Miranda rights and, with the permission of Moseley and Widenhouse, ran a stolen property check on two rifles he noticed in the Camaro. The weapons had not been reported stolen, so they were not seized.
Detective Cook arrived at the scene and questioned Moseley and Widenhouse as to who had been with them in the vehicle. Moseley and Widenhouse initially denied that anyone else had been with them. When Detective Cook informed the two that he knew there had been another passenger, Moseley and Widenhouse named an unrelated party. The two only admitted Monty Smith had been in the car when Detective Cook stated that he knew it was Smith who had been the third person in the Camaro. Moseley advised Detective Cook that Smith had been with them, but they had dropped him off, as Smith had plans to find a ride to Florida. Detective Cook then released Moseley and Widenhouse to attend high school football practice.
Later that afternoon, at football practice, law enforcement officials again questioned Moseley and Widenhouse, who, after again being given Miranda warnings, admitted to participation in the burglaries and that some of the stolen items were at their residence. The officers retrieved the stolen items and, still unaware of what had happened to Smith, asked Moseley and Widenhouse to report to the sheriff's office the following morning. The search continued for Monty Smith.
On August 16, 1989, at 9:00 a.m., Moseley and Widenhouse went to the Bossier Parish Sheriff's office. Moseley was again advised of his Miranda rights and then admitted that he and Widenhouse had murdered Monty Smith. Moseley led sheriff's deputies to the location of Smith's body in a wooded area near Taylortown, Louisiana. Smith had been shot 17, possibly 18 times. Four or five of the wounds alone could have been fatal. Smith's wounds and bullets recovered from his body were variously consistent with both a .38 caliber handgun Widenhouse admitted to using and a.22 caliber rifle recovered from Moseley. Moseley then returned to the sheriff's office, where, at approximately 12:15 p.m., he gave a recorded statement to law enforcement officials in which he more fully outlined the murder and his involvement in it.

MOTION TO SUPPRESS
By Assignments of Error Nos. 1 and 6, the defendant argues that the trial court erred in denying his motion to suppress the recorded statement he made at 12:15 p.m. on August 16, 1989. The defendant alleges *50 that various factors should have rendered the confession inadmissible. These factors include: (1) that the defendant was only 17 years old when he made his confession; (2) that Miranda warnings were not read to the defendant immediately preceding the recorded statement; (3) that Detective Gehlen Padgett's erroneous testimony regarding Miranda warnings rendered the entirety of Detective Padgett's testimony incredible; and (4) that when defendant was read his Miranda warnings approximately three and one-quarter hours prior to the recorded statement at issue, he was crying and too upset to have understood and voluntarily elected to have waived those rights.
Before a confession may be introduced into evidence, the state has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. LSA-R.S. 15:451; State v. Simmons, 443 So.2d 512 (La.1983). The state must also establish that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights and that he waived those rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Simmons, supra.
Defendant's initial argument, that, as a 17-year-old, he should have been entitled to speak to an attorney, a parent, or other interested adult prior to the statement is based on defendant's proposed extension of the holding in State in Interest of Dino, 359 So.2d 586 (La.1978), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). In Dino, it was held that a juvenile[4] must consult with an attorney or an informed parent, guardian, or other adult interested in his welfare before the juvenile can be deemed to have knowingly and intelligently waived his right to counsel and his privilege against self-incrimination. Defendant's argument that this rule should be extended to 17-year-olds was specifically rejected in State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). There was no requirement that the defendant had to consult with an attorney or other adult prior to the waiver of rights and the giving of the statement.
Addressing defendant's second factor, the record does reveal that the defendant was not read his Miranda rights immediately preceding the August 16, 1989, 12:15 p.m. statement. However, the defendant did sign a Miranda rights card prior to the statement, although he claimed not to have read the card before signing it. During the taped confession, however, the defendant clearly admitted that he understood the rights printed on the card and that he nevertheless had chosen to freely and voluntarily give a statement.
The record supports the trial court's determination that the confession was made by the defendant with a complete understanding of his rights. Three Miranda rights cards signed by the defendant were entered into evidence, one from August 15, and two, one at 9:00 a.m. and one at 12:15 p.m., from August 16. The defendant admitted that he was read his rights at Parkway High School on the afternoon of August 15. Additionally, Deputy Netherland testified that he had also read the defendant and Widenhouse their rights when he had stopped their Camaro earlier on August 15. Detective Padgett testified that he read the defendant his rights at 9:00 a.m. on August 16. Detective Cook and Deputy Al Luce corroborated Detective Padgett's testimony that the defendant was read his rights on the morning of August 16. The record clearly supports the trial court determination that the defendant understood, but nevertheless decided to knowingly waive, his Miranda rights at 12:15 p.m.
Moreover, there is no requirement that Miranda warnings be given or repeated each time an arrestee is questioned, absent some showing of coercion on the part of the police. State v. Harvill, 403 *51 So.2d 706 (La.1981); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.1987), writ denied, 508 So.2d 65 (La.1987). Therefore, even assuming the warnings at 12:15 p.m. on August 16 were somehow deficient because they were not verbalized by law enforcement officials, the earlier warnings were sufficient where, as here, there is no showing of any coercion on the part of the police. Miranda warnings were clearly verbalized some three and one-quarter hours earlier. Longer delays between the reading of Miranda rights and the statement have not defeated a finding that the rights were voluntarily waived. See Stumes v. Solem, 752 F.2d 317 (8th Cir. 1985), cert. denied, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985) (five-hour delay); United States ex rel. Henne v. Fike, 563 F.2d 809 (7th Cir.1977), cert. denied, 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776 (1978) (nine-hour delay).
Defendant's third argument concerns the testimony at the motion to suppress hearing of Detective Gehlen Padgett. Detective Padgett initially testified that he thought he had read the defendant his rights at 12:15 p.m. on August 16, but he later acknowledged that he had rather only shown the defendant a Miranda rights form at that time and reminded the defendant that he had gone over those rights with the defendant earlier. The defendant argues that this inconsistency renders Detective Padgett's entire testimony unreliable.
The admissibility of a confession is in the first instance a question for the trial court. Its conclusions on the credibility and weight of testimony relating to the voluntariness of a confession will not be overturned on appeal unless they are not supported by the evidence. State v. Perry, 420 So.2d 139 (La.1982), cert. denied, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); State v. Gaskin, 412 So.2d 1007 (La.1982). In the instant case, the evidence supports the trial court's reliance on the testimony of Detective Padgett. His initial testimony that he thought he had read the defendant his rights was nearly immediately corrected by Detective Padgett. This was at best a minor indiscretion and the remainder of Detective Padgett's testimony was well corroborated by other law enforcement officers.
Finally, the evidence supports the trial court's finding that, although the defendant may have been crying and upset on August 16, there was no evidence that defendant was hysterical and unable to make a voluntary choice to confess. Emotional distress on the part of a defendant is not grounds for rendering a confession inadmissible unless it is so severe that the party confessing is unable to voluntarily do so. State v. McKnight, 539 So.2d 952 (La. App. 2d Cir.1989), writ denied, 548 So.2d 322 (La.1989); State v. Wiley, 513 So.2d 849 (La.App. 2d Cir.1987), writ denied, 522 So.2d 1092 (La.1988).
In conclusion, we find that the record amply supports the trial court's ruling denying defendant's motion to suppress. These assignments of error are without merit.

CHANGE OF VENUE
By Assignments of Error Nos. 7 through 13 and No. 17, it is argued that the trial court erred in changing venue from Bossier Parish to Webster Parish, rather than to some other parish outside the dominant area of the Shreveport media.
Change of venue is regulated by LSA-C.Cr.P. Art. 622, which provides:
Art. 622. Grounds for change of venue
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
The burden of proof is on the defendant who seeks a change of venue to *52 show that such prejudice exists in the collective mind of the community that a fair trial is impossible. State v. Clark, 442 So.2d 1129 (La.1983); State v. Neslo, 433 So.2d 73 (La.1983). This burden requires a showing of more than mere knowledge by the public of the facts surrounding the offense. State v. Giovanni, 409 So.2d 593 (La.1982); State v. Henry, 446 So.2d 1308 (La.App. 2d Cir.1984). The trial court is given much discretion in granting or denying a change of venue. State v. Flood, 301 So.2d 637 (La.1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975); State v. Hall, 549 So.2d 373 (La.App. 2d Cir.1989), writ denied, 556 So.2d 1259 (La. 1990).
In unusual circumstances, prejudice against the accused sufficient to mandate a change of venue may be presumed. This presumption of prejudice will only attach when the trial atmosphere is entirely corrupted by press coverage or when it is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a judicial system of fairness. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); State v. David, 425 So.2d 1241 (La.1983), cert. denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986); State v. Goodson, 412 So.2d 1077 (La.1982).
Factors to consider in determining whether a change of venue is appropriate include: (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. State v. Bell, 315 So.2d 307 (La.1975); State v. Hall, supra. The court may also consider the level of publicity in the area to which the venue could be changed; the care exercised and the ease encountered in selecting the jury; the prospective juror's familiarity with, and the resultant effect of, the publicity; and the peremptory challenges and challenges for cause exercised by the defendant in jury selection. State v. Berry, 329 So.2d 728 (La.1976); State v. Hall, supra. In accordance with these latter factors, it may be appropriate to defer ruling on a motion for change of venue until completion of the voir dire. State v. Goodson, supra; State v. Rodrigue, 409 So.2d 556 (La.1982).
In the instant case, the defendant's initial motion for change of venue was granted and the trial was removed from Bossier to Webster Parish. The trial court stated that the major reason venue was changed from Bossier Parish was to remove it from the area of Parkway High School, a Bossier Parish school which Moseley, Widenhouse and Monty Smith had all attended. The defendant then reurged his motion to change venue, seeking a parish farther removed from the Shreveport media, which had covered the crime to a significant extent. The trial court deferred ruling on the reurged motion until after the completion of voir dire. After a jury had been selected, the trial court denied the motion to change venue from Webster Parish. The issue raised by these assignments of error is whether the trial court erred in ruling that there was not such a degree of prejudice in the collective mind of the Webster Parish community such that it was impossible for the defendant to receive a fair trial.
We note initially that this is not a case in which prejudice may be presumed. The extent and nature of the press coverage did not corrupt the trial. This is not a case in which a circus atmosphere pervaded the trial. The proper degree of sobriety and solemnity was maintained.
Obviously this crime generated significant publicity. However, the majority of the publicity was factual in nature or relatively nonprejudicial to the defendant (references to the defendant as shy, quiet, a good student, the reaction Parkway students had to this crime, etc.). Importantly, *53 however, the pervasiveness of the publicity and its apparent effect on the community was decidedly less in Webster Parish than in Bossier Parish. Circulation of the Shreveport newspapers was greater in Bossier Parish than in Webster Parish. Demographic surveys showed that in Webster Parish, although 72 percent of those surveyed had heard of the crime, 81 percent stated they had no opinion as to the defendant's guilt or innocence. Comparing Bossier Parish, 79 percent of the Bossier Parish voters polled had heard of the case, but only 47 percent had no opinion as to the defendant's guilt or innocence.
We do note that a portion of the publicity appears to have been released by law enforcement officials. A review of the newspaper articles reveals that law enforcement officials appear to have commented upon the confessions of the defendant and Widenhouse, that the murder had been planned and that the motive for the murder was because Smith had stolen from Widenhouse. Especially noteworthy is the front page headline from the August 18, 1989 Shreveport Times: "Deputy: Suspects admit killing."
We are also aware that, following the earliest media accounts of the murder, vandalism was directed at the Moseley residence and vehicles parked thereon. The vandalism itself received media exposure. Such vandalism must be considered evidence of the prejudice against the defendant felt by at least some members of the community.
Finally, we note that the publicity surrounding the offense was consistent, though at times intermittent, from the days immediately following the offense, which occurred on August 15, 1989, through the trial of Bryan Widenhouse,[5] which began with jury selection on February 26, 1990, and through April 20, 1990, the date Widenhouse was sentenced. Moseley's trial began with jury selection on May 21, 1990, approximately nine months after the crime and three months after Widenhouse's trial, but only one month after Widenhouse was sentenced.
The issue is whether the defendant proved that the community prejudice which precluded his obtaining a fair trial in Bossier Parish extended to Webster Parish, thereby dictating the necessity for a further change of venue. The trial court found that such a further change of venue was not warranted and we find no abuse of discretion in this decision. As previously noted, the extent of publicity was less pervasive in Webster Parish. Additionally, the notoriety and personal reactions to this crime were predominately centered in Bossier Parish, especially as the trial court found, among persons with ties to Parkway High School, a school, along with its football team, which apparently provided the link between Moseley and Widenhouse and the victim, Monty Smith.
That it was possible for the defendant to receive a fair, impartial jury and trial in Webster Parish is reinforced by an examination of the voir dire conducted in this case. Fifty-one prospective jurors were questioned. Twenty of these jurors were challenged for cause, the majority because of the extent of their exposure to and knowledge of the case and/or because they had formed an opinion as to the defendant's guilt or innocence. We note that the state did not object to any of the defendant's challenges for cause, and all challenges for cause were automatically granted by the trial court, although the court did note that certain of the challenges would have presented close questions should the state have entered an objection. Thus, the defendant was allowed to eliminate, at his discretion, any prospective juror who seemed to possess too much familiarity with the case or who evidenced an opinion as to the defendant's guilt or innocence. The defendant utilized only eleven of his *54 allotted twelve peremptory challenges during selection of the jury, plus two more during the selection of alternate jurors. The defendant received a fair, impartial jury and the trial court committed no error in refusing to change venue from Webster Parish. These assignments of error are without merit.

REMOVAL OF SWORN JUROR
By Assignments of Error Nos. 15 and 16, the defendant alleges error in the trial court's excusal of a sworn juror due to her illness and in the trial court's refusal to thereafter grant defendant an additional peremptory challenge.
On the afternoon of May 21, 1990, Reba Shadden was accepted by the state and the defendant and was sworn as a juror. The following day, with voir dire still in progress, Ms. Shadden informed the trial court that she had become ill during the night with a sore throat, a headache and coughing and wished to be excused from the jury. The defendant asked Ms. Shadden if she would serve if she saw her doctor and he consented to her jury service. Ms. Shadden answered affirmatively, but noted that her doctor was located 45 minutes away in Springhill, Louisiana. The trial court, without having her see her doctor, excused Ms. Shadden from the jury and denied the defendant's request for an additional peremptory challenge.
This matter is governed by LSA-C.Cr.P. Art. 796, which provides:
Art. 796. Removal of juror after swearing
If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course.
The phrase "incompetent to serve" in Art. 796 includes an illness which renders the juror disabled, unfit or disqualified to perform his duty. State v. Delore, 381 So.2d 455 (La.1980).
The trial court was able to observe Ms. Shadden and assess the extent of her illness. Ms. Shadden stated that her symptoms had worsened since she had awakened that morning and her health was deteriorating. She related to the trial court that her daughters had suffered similar illnesses. One had been sick for a full week without improvement. The trial court determined that it would not be prudent to await a diagnosis from Ms. Shadden's doctor, which would entail an hour and a half round trip, and the additional time Ms. Shadden would spend at the doctor's office, assuming her doctor could see her that day. The trial court noted that not only could Ms. Shadden's illness affect her ability to perform her functions as a juror, but her cough could also adversely affect the ability of the other jurors to concentrate on the evidence. Additionally we note the possibility that Ms. Shadden's symptoms could have been contagious to the other jurors and others in close proximity to her, especially where it appears she may have contracted the disease from her daughters. We see no abuse of discretion in the trial court's rational decision to immediately excuse Ms. Shadden from the jury.
Nor do we find an abuse of discretion in the trial court's refusal to award defendant an additional peremptory challenge. The trial court is not required to grant additional peremptory challenges in each instance where a sworn juror is excused. The option to grant or deny additional peremptory challenges lies within the trial court's discretion. State v. Mitchell, 412 So.2d 547 (La.1982); State v. Polzin, 536 So.2d 667 (La.App. 3d Cir.1988), writ denied, 541 So.2d 870 (La.1989). We find no abuse of discretion in this instance. These assignments of error are without merit.

HEARSAY
By Assignments of Error Nos. 22 and 24, the defendant claims prejudicial error in the state's questioning Detective Padgett and the defendant regarding the statement or confession of Bryan Widenhouse.
During the state's questioning of Detective Padgett, the state asked the detective *55 whether he had spoken to Widenhouse. Defense counsel objected on the basis of hearsay, but the trial court properly ruled that the fact that Detective Padgett had spoken to Widenhouse would not constitute hearsay; rather the hearsay would be the substance of such a conversation. Immediately thereafter the state asked Detective Padgett whether Moseley and Widenhouse had given him the same story. Defense counsel again made a hearsay objection, but the objection came after the witness had related that Moseley and Widenhouse's stories were the same. The trial court specifically noted that the objection should be considered timely and instructed Detective Padgett not to answer questions to which an objection had been asserted. The state then attempted to again ask the same question. Defense counsel again objected, but then withdrew his objection, stating, "[I]f what he's trying to show is that he thinks that their stories were the same, I'll withdraw my objection."
On cross-examination, defense counsel attempted to get Detective Padgett to admit that he was confused as to what Moseley and Widenhouse, respectively, had told him. Specifically, defense counsel questioned Detective Padgett as to who had told the detective that Moseley was standing next to a tree and firing at Smith. Detective Padgett responded that both Moseley and Widenhouse had made that statement.
On redirect examination, the state further questioned Detective Padgett regarding Widenhouse's statement. In his answer to the questions, Detective Padgett referred to a transcription of Widenhouse's taped statement and repeated that Widenhouse, like Moseley, had stated that Moseley stood next to a tree and fired a .22 caliber rifle at Smith. Defense counsel again objected and the trial court overruled the objection, finding that defendant had opened the door to the substance of Widenhouse's statement.
Finally, similar hearsay issues arose during the testimony of Moseley. On cross-examination, the state asked the defendant whether he had told Detective Padgett that he (the defendant) stood by a tree and fired at Smith. The defendant responded, "I never said that I was standing by a tree. That's what Bryan told him." This led to further questions regarding Widenhouse's statement. The defendant again objected to Widenhouse's statement constituting hearsay. The trial court overruled the objection, finding that the defendant had initially alluded to the specific content of Widenhouse's statement, and only thereafter did the state question the defendant regarding Widenhouse's statement.
Clearly the statements made by Widenhouse constituted hearsay when they were related by Detective Padgett and the defendant. LSA-C.E. Art. 801 C. Nevertheless, when the state initially sought to elicit the hearsay testimony regarding Widenhouse's statement, defense counsel specifically withdrew his objection. A contemporaneous objection is necessary to preserve an error for appellate review. LSA-C.Cr.P. Art. 841. The purpose of the contemporaneous objection rule is to allow the trial court the opportunity to rule on the objection and thereby prevent or cure an error. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Herrod, 412 So.2d 564 (La.1982). Here, defense counsel's withdrawal of his initial objection prevented the trial court from admonishing the jury to disregard any testimony as to Widenhouse's statements and prevented the trial court from instructing the state and Detective Padgett to refrain from any future references to the statement. By withdrawing the objection, defendant failed to preserve the initial hearsay objection for appellate review.
Thereafter the defendant, during cross-examination of Detective Padgett, engaged in additional questioning regarding Widenhouse's statement. This further "opened the door" on this issue and entitled the state to more fully explore this area on redirect examination. See State v. Smith, 513 So.2d 438 (La.App. 2d Cir.1987); State v. Kelly, 456 So.2d 642 (La.App. 2d Cir.1984), writ denied, 461 So.2d 312 (La. 1984). The trial court therefore correctly overruled the defendant's hearsay objection *56 during the state's redirect examination of Detective Padgett.
Finally, any references to Widenhouse's statements during the defendant's testimony were merely cumulative of the evidence of Widenhouse's statement which the jury had heard during Detective Padgett's testimony. Even if this was hearsay, inadmissible hearsay which is merely cumulative or corroborative of other testimony adduced at trial is considered harmless. State v. Spell, 399 So.2d 551 (La. 1981); State v. McIntyre, 381 So.2d 408 (La.1980), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980). These assignments of error are without merit.

JURY CHARGE
The defendant argues that it was error for the trial court to fail to charge the jury that they could return a verdict of guilty of attempted second degree murder, which defendant asserts should be considered a responsive verdict to a charge of second degree murder.
The defendant failed to make a written request that a special charge on attempt be given to the jury, as required under LSA-C.Cr.P. Art. 807. The failure to make such a request for a special charge precludes review of the issue on appeal. LSA-C.Cr.P. Art. 841; State v. Jackson, 301 So.2d 598 (La.1974); State v. Hamilton, 459 So.2d 216 (La.App. 3d Cir.1984).
Moreover, the defendant's argument, even if it had been preserved for review on appeal, is without merit. A trial court is without authority to add to the listed responsive verdicts under LSA-C.Cr.P. Art. 814. State v. Square, 433 So.2d 104 (La.1983); State v. Thibodeaux, 380 So.2d 59 (La.1980). Attempted second degree murder is not a responsive verdict to a charge of second degree murder. LSA-C.Cr.P. Art. 814 A 3. Thus, a trial court may not charge the jury with attempt where the defendant has been charged with first or second degree murder. See State v. Parker, 416 So.2d 545 (La.1982); State v. Lindsey, 404 So.2d 466 (La.1981), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983); rehearing denied, 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983). See also Comments to LSA-C.Cr.P. Art. 814. This assignment of error is without merit.

SUFFICIENCY OF EVIDENCE
By Assignments of Error Nos. 31, 32, 34 and 35 the defendant alleges error in the trial court's refusal to grant a post verdict judgment of acquittal and/or a new trial. The defendant's argument in support of his motions, as well as his argument on appeal, is that there was insufficient evidence to support the second degree murder conviction. The standard of review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Nealy, 450 So.2d 634 (La.1984). Specifically, defendant argues that there was insufficient evidence that he had the specific intent to kill or to inflict great bodily harm upon the victim. Specific intent is a state of mind and need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982).
The most damaging evidence that the defendant had the requisite specific intent to kill or inflict great bodily harm comes from his own confession which we have held was properly admitted into evidence. During that confession, the defendant admitted that he and Widenhouse intended to kill Monty Smith when they took him into the woods on August 15, 1989. Although Moseley claimed he thought Widenhouse was kidding when, a week before the crime, Widenhouse initially expressed his intent to kill Smith, Moseley admitted during his confession, that, on the day of the shooting, he knew Widenhouse was serious. Nevertheless, Moseley agreed to help Widenhouse kill Monty Smith and *57 went to the woods with the intention of shooting Smith.
Although the defendant would not unequivocally state that he shot at Monty Smith during his taped confession, he admitted that he may have hit him once or twice. Moseley additionally stated that, after the initial outburst of gunfire, with Widenhouse using the .38 and Moseley the.22, Smith was not yet dead. Widenhouse took the .22 from Moseley and, after a discussion between Widenhouse and Moseley that they needed to shoot Smith again, Widenhouse shot Smith in the arm and in the back of the head.
Clearly, based on this evidence, a jury could reasonably have found that the defendant went to the woods with the intent that he and Widenhouse would kill Smith, that he fired in Smith's direction, hitting him once or twice,[6] and that he discussed with Widenhouse that Smith needed to be shot again. Moseley's self-serving trial testimony, that he did not intend to kill Smith, that he fired only at the ground and that his actions were dictated solely by his fear of Widenhouse could reasonably have been disregarded by the jury.
We note that the defendant's trial testimony, that all his actions resulted from his fear of Widenhouse, is rendered unreliable by his repeated failure to advise law enforcement officials or others of the murder and thereby remove any threat to himself from Widenhouse. Immediately following the murder, Moseley and Widenhouse covered Smith's body with sticks and twigs and removed Smith's yellow tennis shoes, apparently to deter discovery of Smith's body. Then Moseley and Widenhouse were stopped by Deputy Netherland, but Moseley did not inform Deputy Netherland or Detective Cook of Smith's murder and initially, repeatedly denied that Smith had been with them. Moseley had a later opportunity to inform law enforcement officials of the murder at football practice, but again declined to do so. Finally, the evidence shows that the defendant's uncle is a sergeant with the Bossier City Police Department. The defendant sought advice from his uncle regarding his involvement in the theft and burglary ring, but made no mention of the murder of Smith.
Moseley's actions following the crime were simply inconsistent with his alleged fear of Widenhouse, which he claims precluded his possessing the specific intent to kill or inflict great bodily harm upon Monty Smith. Every opportunity the defendant had to relay his fears of Widenhouse and the circumstances of the crime to law enforcement officials was bypassed, including the opportunity to inform a relative whom the defendant trusted enough to relate his other criminal problems. Viewing the evidence in a light most favorable to the prosecution, we find that the state proved beyond a reasonable doubt that the defendant had the specific intent to kill or inflict great bodily harm upon the victim. Accordingly, these assignments of error are without merit.

ERROR PATENT
By Assignment of Error No. 36, the defendant requests a review of the record for errors patent. This court makes such a review in every criminal case without the need for a formal assignment of error. LSA-C.Cr.P. Art. 920(2). A review of the pleadings and proceedings in this case reveals no errors patent.

CONCLUSION
As we find that none of the defendant's assignments of error have merit, we affirm his conviction and sentence.
AFFIRMED.
NOTES
[1] An additional 17 assignments of error have not been briefed by defendant and will therefore be deemed abandoned. State v. Schwartz, 354 So.2d 1332 (La.1978); URCA 2-12.4.
[2] Widenhouse was separately tried and convicted of second degree murder. His conviction has been affirmed by this court. State v. Widenhouse, 582 So.2d 1374 (La.App. 2d Cir.1991).
[3] The record reveals that Widenhouse had moved into the Moseley residence in order that he might finish his senior year at Parkway High School after his family had moved to Florida.
[4] Moseley, 17 years old at the time of the murder, is considered an adult for purposes of this criminal prosecution. LSA-Const. Art. 5, § 19; LSA-R.S. 13:1570.
[5] Media accounts of the trial and conviction of Widenhouse, although implicating Moseley and noting that he would be tried on the same charge at a later date, did not alone mandate a change of venue, as the accounts were given in an objective manner and did not tend to incite passion and prejudice among the public. See State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Walters, 514 So.2d 257 (La. App. 5th Cir.1987), writ denied, 523 So.2d 811 (La.1988).
[6] Even if the jury found that the defendant's gunshots did not hit Smith, there was sufficient evidence to sustain the conviction. The evidence showed the defendant had the specific intent to kill Monty Smith and that he aided Widenhouse in luring Smith into the woods, where Widenhouse killed him. There was also evidence that the defendant counseled Widenhouse after the initial outburst of gunfire, advising him that Smith was not yet dead and that Widenhouse needed to fire again to kill Smith. The defendant would thereby be guilty of second degree murder as a principal. LSA-R.S. 14:24; State v. Tobias, 452 So.2d 157 (La.1984).