JiSEXTON, Judge.
The defendant, Joseph B. Collins, was convicted as charged of armed robbery in violation of LSA-R.S. 14:64. He was sentenced to forty years at hard labor without benefit of parole, probation or suspension of sentence. He appeals his conviction and sentence but has failed to brief several assignments of error including those regarding sentencing. Because the one assignment of error briefed, insufficiency of evidence, lacks merit, we affirm.
FACTS
On Sunday, September 20, 1992, Steven Potter was shot and killed as he unloaded trash at a trash dumpster located on Norris Ferry Road in Caddo Parish. Frederick Thompson, Willie Plater, Jr., and the defendant were subsequently charged with the first degree murder of Mr. Potter. Thompson pled guilty to first degree murder and was sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence. Plater was convicted of second degree murder and sentenced to life imprisonment, without benefit of parole, probation, or suspension of sentence. On February 25, 1994, defendant’s charge was reduced to armed robbery. On March 23, 1994, defendant was convicted as charged. He was sentenced to forty years at hard labor without benefit of parole, probation, or suspension of sentence.
The evidence- adduced at defendant’s trial included the following. At approximately 8:00 p.m. on September 20, 1992, Steven Potter gathered trash to take to the compactor on Norris Ferry Road. When he did not return within a short period of time, his wife, Reni Potter, became concerned and drove with her children to the compactor to look for him. Although she did not find Mr. Potter or his car, she saw a trash can which belonged to them. She returned home and called the Caddo Parish Sheriffs Office.
|2Caddo Parish Sheriffs Deputy James La-ney was dispatched to Mrs. Potter’s home at about 8:30 p.m. After speaking with Mrs. Potter, he went to the dumpster and observed blood on the pavement on the west side of the dumpster about 12 feet from the dumpster, a brown trash can and a rubber strap of the type used to hold trash cans on a car. The Sheriffs Department secured the area and began looking for Mr. Potter’s car. A description of the red four-door 1991 Ford Taurus with a temporary license tag was broadcast to area police and sheriffs’ departments.
On Monday, September 21, 1992, at approximately 11:00 a.m., off-duty Shreveport Police Officer James Diekard, spotted Mr. Potter’s ear as it drove through his apartment complex and followed it to the circle drive at Captain Shreve High School. The two young males that Officer Diekard had observed riding in the car, Frederick Thompson and Ricky Taylor, were arrested at the school.
Based upon information provided by Frederick Thompson, Caddo Parish Sheriffs Deputy Camie Burcham located Mr. Potter’s body on Robson Road, which runs between Ellerbe Road and Louisiana Highway 1. Also based upon information provided by Frederick Thompson, Willie Plater, Jr. and the defendant were arrested on September 21, 1992. Thompson’s .38 caliber pistol was recovered when Ricky Taylor’s mother found it under the mattress in Taylor’s bedroom, where Thompson had spent the night of September 20, 1992.
Fingerprints taken from the outside of the car were identified as Thompson’s and Pla-ter’s. Clothes belonging to Thompson, Pla-ter, and the defendant were found in the trunk. A bullet fragment and five lead frag *687 ments were removed from Mr. Potter’s body. Although the bullet fragment was consistent with being fired from a .38 caliber weapon, the lead fragments were too badly damaged for positive identification.
| ¡¡Various members of the defendant’s family testified that he was at a family reunion on Bullhorn Drive (also referred to as Bullhorn Private Drive) on September 20,1992. Deputy Burcham described Bullhorn Drive as a gravel and dirt road which runs from Norris Ferry Road to Overton Brooks Road, approximately 100 feet north of the trash compactor.
There are several houses on Bullhorn Drive, including those belonging to the defendant’s father and stepmother and Plater’s parents. On the east side of Bullhorn Drive, and across from the houses is a ballpark type field where members of the defendant’s and Plater’s family were playing softball and volleyball that Sunday. There is a trail through the woods, approximately 50 to 75 feet long, from the ballfield on Bullhorn Drive to the KCS railroad tracks on Norris Ferry Road. Deputy Burcham stated that a person could walk from the railroad tracks to the ballfield in a matter of seconds.
Neither Thompson nor Plater testified at the defendant’s trial. However, Deputies William Lundsford and James Bonnette testified regarding certain statements made by Thompson and Plater after their arrest on September 21, 1992. Both deputies testified that Plater and Thompson stated that the defendant stood on the railroad tracks and acted as the “lookout.” Plater stated that the defendant ran after the shot was fired.
Defendant gave three separate recorded statements to deputies on September 21, 1992. Although he did not testify at trial, these statements were admitted into evidence and played for the jury.
In his first statement, he said that he and his cousin, Willie Plater, Jr., did not have anything to do with the shooting. Thompson was at the reunion and they had walked with him to Norris Ferry Road at 8:40 or 8:45 p.m. As they walked back to the ballfield, they heard a gunshot but did not think anything of it.
UThirty minutes later, Thompson called and asked if they wanted to go riding in a rented car. He and Plater met Thompson at Overton Brooks Road. They took clothes to change into because they had been playing volleyball and were going to see some girls. Plater also took a change of clothes for Thompson. After visiting a girl in Lakeside, they all changed clothes at a convenience store.
As the defendant put his clothes in the trunk of the ear, he saw blood on the bumper and inside the trunk and asked Thompson where it came from. Thompson replied, “I took this car,” and asked the defendant if he had heard shooting. Thompson had a .38 with him and emptied a spent shell casing on the street. When Plater came out of the store, the defendant said he wanted to go home.
Thompson had the .38 with him earlier at the reunion. He had told the defendant and all his cousins that he was going to “jack mood” someone. “Jack mood” means shooting or pulling a gun on someone. Because he was laughing when he made this statement, they thought that he was jesting.
In his second statement, the defendant stated that he knew that Thompson and Pla-ter were “fixing to jack somebody” for their ear. They had planned it earlier that day and wanted him to watch for cars. He didn’t think they were really going to do it until he saw them hiding. Plater was in the woods across the street from the dumpster and Thompson “was standing over there by the dump.” He was “either behind it or on the side of one. You couldn’t see him.”
Defendant was supposed to be down by the railroad tracks watching for cars, but when he saw Thompson hiding, he went home through the woods. He heard Thompson and Plater calling him when he left, but he did not go back. He was talking to Reginald Demming and Chris Davenport when he heard the gunshot. After hearing the gunshot, he thought Thompson and Plater had shot someone or had gotten shot.
IsAbout thirty minutes later, Plater came up the road and said that he and Thompson were going riding and wanted the defendant *688 to come with them. The defendant and Pla-ter went out to the car and rode to Lakeside. They visited a girl, then changed clothes in an alley. Plater told him that “a dude pulled up and he was unloading plants from the car, and Fred came up from behind and shot him.” He guessed they had been to dump the body after he heard the gunshot. Plater told him that they took care of some business.
In his third statement, the defendant admitted that he, Thompson, and Plater had discussed taking a car from someone at the dumpster. He knew that Thompson and Pla-ter were going to “go up to the man and (inaudible) come out the ear, but wasn’t nobody gonna get shot....” Thompson had a chrome .38 with no side or handle grips. Defendant was supposed to be the lookout on the railroad tracks but “when everybody got in position” he had second thoughts and went home. He saw Thompson standing in front of the dumpster, but then no longer saw him and thought he must have jumped the fence. At the time the defendant left, they were ready for the man to come. He heard Plater calling his name as he went home and guessed that somebody “had pulled in the dumpster, and they was calling for me to be on the look out.”
He went home and acted as though nothing had happened. He was with his cousin when he heard the gunshot and was “pretty sure” that Thompson and Plater had shot someone. About thirty minutes later, Plater came to the defendant’s house and told him that Thompson had gotten a car and they were going riding. Thompson called and said he had his cousin’s ear. Defendant knew that it was not Thompson’s cousin’s car because he had heard the gunshot.
Defendant, Thompson, and Plater went riding and visited some girls. They changed clothes and put their clothes in a bag in the trunk. He saw blood in the | ptrunk and asked about it. Plater said that “Fred just walked up and shot the man.” They told him they had “put the man somewhere” in the thirty minutes after the shooting. He had no doubt the man was dead, but did not want to believe it.
Defendant’s cousin, Reginald Demming, testified that he was at the reunion on Bullhorn Drive on September 20, 1992. He heard a gunshot at 7:45 p.m. or 7:50 p.m. At the time he heard the gunshot, the defendant was standing in front of him and had been there for about five to ten minutes. Prior to that time, he had seen the defendant standing in his father’s yard. He denied telling Deputy Burcham on September 21, 1992, that he saw both the defendant and Plater at the time he heard the shot. Deputy Burc-ham was recalled as a rebuttal witness and testified that on September 21, at around 5:30 p.m., he interviewed Reginald Demming. Demming told him then that both the defendant and Willie Plater, Jr. were at the ballpark when he heard the gunshot.
Defendant’s cousin, Sharon Peyton, and her husband, Melvin Peyton, testified that at about 8:00 p.m. on September 20, 1992, they were returning to their home on Bullhorn Drive. They saw a car came out of the trash dumpster area. Mrs. Peyton said the car was burgundy or red. Mr. Peyton said the ear was a dark colored Ford Taurus. Both said they only saw one man in the car. After seeing the car leave the dumpster, they had to wait for several cars to pull out of Bullhorn Drive before they could turn in. As they drove down Bullhorn Drive, they saw a group of Mrs. Peyton’s cousins standing around, including the defendant and Reginald Demming. Although they knew that the defendant had been charged initially with the murder and later with the robbery of Mr. Potter, they did not inform the sheriffs office or the district attorney’s office regarding this testimony prior to trial.
Defendant’s brother-in-law, Alton Anthony, testified that he was at the family reunion on Bullhorn Drive on September 20, 1992. He saw the defendant standing |7with Reggie Demming and Chris Davenport from 7:45 p.m. until 7:50 p.m. He also saw the defendant in the defendant’s father’s house from 7:55 p.m. until 8:30 p.m. when Plater came into the house and the defendant left with him. The next time that Mr. Anthony saw the defendant, the defendant and Plater were walking up Bullhorn Drive from Overton Brooks Road at about 10:45 p.m.
*689 Defendant’s sisters, Letisha Anthony and Constance Collins, testified that they left the family reunion on Bullhorn Drive to go to the store and returned at 7:45 p.m. Mrs. Anthony stated that the defendant asked her for a soda at about 7:55 p.m. Ms. Collins testified that she saw the defendant at 7:45 p.m. and 8:00 p.m. Both stated that they did not see the defendant again until 10:45 p.m. Mrs. Anthony stated that when she saw the defendant at 10:45 p.m., he was walking up Bullhorn Drive from Overton Brooks Road with Plater.
Defendant’s stepmother, Ella Plater, testified that she saw the defendant on the ball-field at 7:50 p.m. She saw him again at 8:10 p.m. when he came into the house and talked on the phone. Thompson called for the defendant but she would not let the defendant talk to him. She saw Plater come into the house just before she went to take a bath. When she finished her bath at 8:30-8:35 p.m., the defendant and Plater were gone. Defendant came home about 10:30 p.m.
LaSandra Carter testified that she was the defendant’s friend. He called her at 8:15 p.m. on September 20, 1992, and said he was going to come by her house. Defendant, Thompson, and Plater came to her house between 8:45 p.m. and 9:00 p.m. They were in a ear she had never seen before. Plater was driving, Thompson was in the front seat, and the defendant was in the back. She did not talk to them because she was leaving with her aunt, who had just gotten off work at 8:30 p.m. She told the defendant that she would be back later, but she did not see or talk to him again that night.
IgRicky Taylor testified that Thompson picked him up in a maroon Taurus sometime after 9:50 p.m. on September 20, 1992. Thompson said the car was rented for the week. They visited Taylor’s girlfriend at 10:00 or 10:30 p.m., then went to another girl’s house in Ceder Grove and returned to Taylor’s house. Thompson spent the night at Taylor’s house and where he hid a .38 caliber pistol under the mattress in Taylor’s room.
DISCUSSION
Assignments of Error Numbers 1, 2, 3, 5 and 6 have not been briefed. Assignments of error which are neither briefed nor argued are considered abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App.2d Cir.1989); writ denied, 558 So.2d 1123 (La.1990). Therefore, these assignments will not be discussed.
ASSIGNMENT OF ERROR NUMBER 4:
Defendant asserts the evidence is insufficient to support defendant’s conviction for armed robbery
In this assignment, the defendant contends that the evidence presented at trial is insufficient to support his conviction for armed robbery. The proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the. crime were proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cotton, 25,940 (La. App.2d Cir. 03/30/94), 634 So.2d 937.
The Jackson standard applies to both direct and circumstantial evidence. Direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the |9main fact may be inferred according to reason and common experience. State v. Lilly, 468 So.2d 1154 (La.1985); State v. Turner, 591 So.2d 391 (La.App.2d Cir.1991), writ denied, 597 So.2d 1027 (La.1992). For circumstantial evidence to convict, it must exclude every reasonable hypotheses of innocence. LSA-R.S. 15:438.
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. LSA-R.S. 14:64. Those persons concerned in the commission of the offense, *690 whether present or absent and whether they have aided and abetted, counseled or procured another person to commit the prohibited act, are principals in that offense. LSA-R.S. 14:24. However, only those persons who knowingly participate in the planning or execution of a crime are principals. State v. Pierre, 93-0893 (La. 02/03/94), 631 So.2d 427; State v. Bellamy, 599 So.2d 326 (La.App.2d Cir.1992), writ denied, 605 So.2d 1089 (La. 1992). A person may be guilty of an armed robbery for standing by as a lookout. Bellamy, supra.
The defendant asserts that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he was a principal to the offense because: (1) the state’s case was based on hearsay testimony; (2) the state failed to prove that he was present at the time of the armed robbery; and (3) the state failed to prove that he had the intent to commit the armed robbery.
HEARSAY TESTIMONY
In his first argument, the defendant asserts that the evidence is insufficient to support his conviction for armed robbery because the state based its case on the hearsay testimony of Deputy Lundsford. However, the record reflects that the defendant failed to object to this testimony at trial. A contemporaneous objection is necessary to preserve an error for appellate review. LSA-C.Cr.P. Art. 841. Hearsay |10evidence not objected to constitutes substantive evidence which may be used by the trier of fact to the extent of any probative or persuasive power that it may have. State v. Boutte, 384 So.2d 773 (La.1980); State v. Tyler, 544 So.2d 495 (La.App.2d Cir.1989).
Moreover, the record reflects that during cross-examination by the defense, Deputy Lundsford was questioned regarding his reasons for interviewing the defendant the third time. In explanation, he stated:
A. I knew that his statement did not say the same thing that the other two defendants said. The other two defendants’ statements were fairly consistent except with the point of who actually pulled the trigger. I found Mr. Collins’ statement not to be consistent with their statement in all areas, no, sir.
Q. As to who pulled the trigger?
A. Mr. Plater specifically says that when the shot was fired, afterwards, he saw Joseph Collins run from the scene at that point. His testimony, he stated was there. He saw Mr. Collins run after the shot was fired.
On redirect examination, the prosecutor further questioned Deputy Lundsford about the inconsistencies in the defendant’s statement when compared with the statements of Plater and Thompson:
He said that he heard them call out for him. Mr. Plater’s statement states in fact that he did call out for Joseph Collins as he saw Joseph Collins run away from the railroad track after the shot was fired.
[[Image here]]
Frederick Thompson said that Joseph was on the railroad tracks at one point, although he was not sure when he left. He couldn’t find him after the shot was fired.
Therefore, even if it is arguable that the statements made by the officer were hearsay, nevertheless, the defendants “opened the door” on the issue and thereby entitled the state to more fully explore this area on redirect examination. State v. Moseley, 587 So.2d 46 (La.App.2d Cir.1991), writ denied, 589 So.2d 1066 (La.1991).
I, DEFENDANTS PRESENCE AND INTENT
In the final part of the defendant’s insufficiency of evidence argument, he asserts that the state failed to prove that he was present at the trash compactor at the time Mr. Potter was shot due to a statement by the prosecutor in closing argument suggesting that a person could not see over the railroad tracks from the compactor. The defendant contends that, based upon that statement, a reasonable juror could not have found that Plater saw the defendant run after the shot was fired.
Further, the defendant argues that the-state failed to establish that he had the intent to commit armed robbery because it did not *691 prove that he knew Thompson and Plater were armed before the robbery. These arguments lack merit for the following reasons.
Relevant to the statement made by the prosecutor, the jury was adequately instructed that statements by attorneys during argument were not to be considered evidence. Further, Deputy Burcham testified that as Norris Ferry Road proceeds north from the compactor, it gradually rises up to cross the railroad tracks, then drops again after. it crosses the tracks. He stated that a person standing at the compactor could not see traffic over the railroad grade. The defendant stated that he was to act as the lookout “at the front of the railroad track,” not on the declined portion of the road on the other side of the tracks. Therefore, a reasonable juror could have concluded that Plater could have seen the defendant as he stood on the elevated portion of the road where the railroad tracks cross.
Further, the evidence demonstrates the requisite intent. The evidence established that Mr. Potter’s car was taken from him by force by persons armed with a dangerous weapon. The defendant’s statements alone establish by direct evidence that he knowingly participated in the planning of the armed robbery. He stated that he, Plater, and Thompson had discussed taking a car from someone at the dumpster. [^Earlier that day, he had seen Thompson with the gun and heard him talking about shooting someone. He knew that Thompson had the gun with him when he hid at the compactor and that Thompson and Plater were going to make someone get out of their car so they could take it from that person’s immediate control by force. Plater’s statement indicates that the defendant knowingly participated in the execution of the armed robbery by acting as the lookout until after the shot was fired. Even after the armed robbery and murder of Mr. Potter, the defendant stated that he knew that Thompson and Pla-ter had shot someone at the dumpster, but went home and acted as though nothing had happened. He admitted that he went riding in Mr. Potter’s car thirty minutes after the shooting although he knew that Thompson and Plater had shot someone and taken the car. He and Plater even took clothes for Thompson so that he could change out of the clothes worn during the murder.
When viewed in the light most favorable to the State, this evidence establishes beyond a reasonable doubt the requisite intent by the defendant to commit the crime of armed robbery as well as the defendant’s participation as a principal in the armed robbery of Mr. Potter.
ASSIGNMENT OF ERROR NUMBER 7:
Defendant asserts any and all errors patent and all arguable errors on the face of the record.
The defendant’s final assignment asserts all errors patent. The record has been examined for error patent, LSA-C.Cr.P. Art. 920(2), and none have been noted.
CONVICTION AND SENTENCE AFFIRMED.