Judgment rendered June 28, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,070-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

TIMOTHY C. HOWELL                           Appellant

* * * * *

Appealed from the
Second Judicial District Court for the
Parish of Claiborne, Louisiana
Trial Court No. 32,982

Honorable Walter Edward May, Jr., Judge

* * * * *

LAVALLE B. SALOMON, APLC                    Counsel for Appellant
By: Lavalle B. Salomon

DANIEL W. NEWELL                            Counsel for Appellee
District Attorney

JENNIFER POOL MCKAY
CARY T. BROWN
Assistant District Attorneys

* * * * *

Before COX, THOMPSON, and MARCOTTE, JJ.

**COX, J.**

This criminal appeal arises from the Second Judicial District Court of Claiborne Parish, Louisiana. Timothy Howell ("Howell") was charged with one count of second degree murder of Jason Staples ("Staples"), in violation of La. R.S. 14:95.1. Following a six-day jury trial, Howell was found guilty by a unanimous jury and was sentenced to mandatory life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. For the following reasons, Howell's conviction and sentence are affirmed.

**FACTS**

On June 17, 2020, Howell was indicted for second degree murder by a grand jury. On September 20, 2021, a six-day jury trial commenced, wherein the State introduced the following pertinent testimony from the following officers and expert witnesses:

First, Louisiana State Police ("LSP") Investigator Garrett Monroe ("Inv. Monroe") testified that on December 10, 2019, dispatch received a call from truck driver Jeffory Yawn ("Yawn") that a pedestrian was lying on the side of the road at the intersection of La. Hwy. 146 and La. Hwy. 533. When officers arrived, they saw a purple/blue colored 2005 Chevrolet Impala with hazard lights on,[1] and the victim's body about 100 feet away from the vehicle. Officers initially believed the victim, later identified as Staples, was struck by a vehicle; however, after the body was moved, officers discovered two shell casings near the body and another shell casing a little farther away.[2] Inv. Monroe stated that aside from the two gunshot

---

[1] Inv. Monroe reported that the truck was found on the shoulder of Hwy. 146, facing east toward Ruston.

[2] Deputy Cody Dooley testified that he found keys under Staples' body and a spent shell casing on the ground approximately three to four feet from the body.

wounds to his chin and cheek, Staples had no other apparent injuries. Because Staples still had his phone and wallet with money and credit cards, there was no evidence to suggest he was robbed, so officers investigated a potential homicide.

Inv. Monroe testified that the first discovered shell casing was only a few feet away from the body and was a silver F.C. 9mm Luger; the second was approximately five feet from the body and was a silver N.F.C.R. 9mm Luger; and the third shell casing was a bronze Winchester 9mm Luger. Inv. Monroe further testified that officers also found a water bottle[3] at Staples' feet and noticed the stop sign near the intersection had bullet holes in it.[4] Inv. Monroe testified that the bullets removed from Staples were determined to have been shot from the same Hi-Point 9mm gun and that the shell casing found closest to Staples was also fired from a Hi-Point 9mm.[5]

Inv. Monroe testified that while at the scene, Mickey Harmon ("Harmon"),[6] who owned property near the area, informed officers that he saw Staples in the same area the previous day, and that Staples borrowed his

_____

[3] Jacob Watts, a forensic analyst, testified that he analyzed the water bottle found at the scene and compared it to the swab collected from Howell. He testified that the DNA profile generated from the water bottle revealed that Howell's DNA was present and was a major contributor. He also testified that he was unable to gather a DNA profile for the shell casings often because the heat from firing a gun can destroy any DNA evidence.

[4] Chief Anthony Smith also testified that when called to the scene, he noticed the stop sign with bullet holes, and a Vitamin water bottle at Staples' feet. He also stated he assisted in moving the body and also noted the two gunshot wounds on Staples' cheek and chin.

[5] Deputy Roger Smith also testified that in February 2020, he went back to the scene of the incident with a metal detector to look for any potential evidence that may have been overlooked. He stated that he located one shell casing on the side of the road, and then had to dig, but located three other shell casings under the ground.

[6] Harmon testified that while Staples used his phone, a man in a dark-colored truck, that Staples identified as "Tim," gave Staples a ride.

phone because his vehicle broke down. Harmon's phone records reflected that at 5:39 p.m., Staples made five calls: four to a woman identified as Kayla Deason ("Deason") and one to Sunni Howell ("Sunni"), Staples' then-girlfriend, and Howell's sister.[7] Officers conducted interviews with several people, including Staples' mother, Jacqueline Staples ("Mrs. Staples"),[8] Sunni, Howell, Judy Howell ("Mrs. Howell"), and Deason. From this, officers learned that Anthony Futch ("Futch") evicted Staples and Sunni from the home they rented from Futch's father in Homer for failure to pay rent.

Officers learned that Staples and Sunni moved from their shared home on December 9. While moving, Staples left and attempted to go buy drugs from Deason in Ruston. Howell, while en route to help Sunni move furniture, saw Staples' vehicle had broken down on Hwy. 146, and gave him a ride. Howell helped Sunni and Staples move for a few hours, and around 11:00 p.m., took Staples to Keith Food Mart to get gas. Howell told officers that he agreed to buy drugs with Staples, but after the vehicle wouldn't start, he left because something felt "sketchy." Howell told officers when he left, Staples was near his car and had made another phone call.

Inv. Monroe testified that he interviewed Deason and her boyfriend, Jesse Flowers', phone records and confirmed that neither phone left the Ruston area that night. Deason also confirmed that Staples made plans to

---

[7] Through Mrs. Howell's testimony, it was discovered that Sunni is now deceased.

[8] Mrs. Staples testified that Staples had been in a relationship with Sunni for 15 years and that he often used Sunni's phone. She admitted that Staples had a substance abuse problem and struggled financially. She also informed officers that Zane Miller ("Miller") was in possession of a truck Staples owned and that the two had a dispute over loan payments.

buy drugs from her, and the last time she spoke with him was around midnight. She reported that during the call, Flowers attempted to help Staples fix the vehicle and she could hear Staples and Howell arguing, with Staples telling Howell to "man up."

Inv. Monroe testified that he also reviewed the gas station surveillance footage[9] and confirmed that Staples and Howell were there at approximately 11:00 p.m. before the store closed, and purchased gas and drinks. He stated that two men, Fredrick Kelly ("Kelly") and Nathan White ("White"), could be seen pushing a car into the station. Howell gave them a bottle of oil before leaving with Staples, but Kelly and White stayed until about midnight. Inv. Monroe testified that he contacted and obtained phone records for Kelly and White, who reported that after they left the gas station, their car broke down again near Staples' home, where they left it, before getting a ride to "Dog's" home in Minden. Inv. Monroe testified that neither Kelly's nor White's phone numbers were found within the cellphone tower data where Staples' body was found.

Inv. Monroe then testified that he obtained phone records for Miller and Futch.[10] Inv. Monroe stated that Miller admitted he agreed to pay the remainder of Staples' truck loan, but the two had a disagreement about payments, and ultimately, he took the truck from Staples and it was in his possession when Staples died. From surveillance footage on Catherine Bass' ("Bass") home in Minden, where Miller lived with Bass and his

---

[9] Inv. Monroe testified that during the encounter, no hostility could be seen between any of the men, and that no one was seen going into Howell's truck.

[10] Inv. Monroe similarly testified that Futch's phone was not found within the tower data, and there was no evidence to link Futch to the incident.

4

girlfriend, Cynthia Doyle ("Doyle"), Inv. Monroe confirmed that Miller arrived home around 11:00 p.m., and stayed there. Inv. Monroe testified that at one point, Miller went outside to move his truck from the front to the back of the home. Although the back camera was charging at this time, both Doyle and Bass confirmed that Miller came back in from the back door and stayed home the entire night. Moreover, Inv. Monroe stated that Miller's phone number was not found within the cellphone tower data.

Inv. Monroe testified that a month later, officers received an anonymous tip claiming that Ronald Moon ("R. Moon") and Rochelle Nugent ("Nugent") set up a drug deal, and during the transaction, shot, and robbed Staples. In following the tip, Christopher Bell[11] ("Bell") reported that R. Moon claimed he shot Staples, but Inv. Monroe indicated that Bell struggled with substance abuse and Bell admitted that he smoked marijuana when the conversation occurred. Inv. Monroe stated that officers interviewed Nugent, R. Moon, and his son, Colby Moon ("C. Moon"), and learned that R. Moon and Nugent lived in Dubach, both denied knowing who Staples was, and no evidence was ever discovered to link them to the incident.

Inv. Monroe testified that because Howell was the last known person to see Staples alive, they interviewed him again, for a total of three interviews. During an evidentiary hearing,[12] Inv. Monroe testified that

---

[11] Bell testified that he struggled with substance abuse but is currently sober. He stated that he sustained an injury to his head and now struggles with memory loss following the incident. Bell was unable to recall if he told investigators that R. Moon claimed to have shot Staples.

[12] The trial court judge allowed Howell's statements from each interview to be admitted as evidence.

Howell was given his *Miranda* rights before each interview and that he was generally cooperative. Inv. Monroe stated that during the first interview, Howell reported that he did not know what time he left Staples after they got gas, and phone records attested that Howell's phone went "offline" around 9:30 p.m. and did not show activity again until 4:30 a.m. In his second interview, Howell admitted he kept a Hi-Point 9mm gun in his truck and that he had it the night he was with Staples. Howell admitted that he was frustrated with Staples because Sunni was alone in Homer.

Howell added that when he left Staples, he went to Micah Bernice's[13] home in Calhoun.[14] When asked what should happen to the person responsible, Howell only stated that a person had a right to defend themselves, if "Staples was acting irate." In his final interview, Howell stated that his attorney advised him not to answer questions, but he ultimately spoke with officers. He primarily reiterated his previous statements, that he owned a Hi-Point 9mm and that he did not see anyone go in his truck, but it was possible, and admitted that he had been agitated with Staples.

Finally, Inv. Monroe testified that before Howell's last interview, he obtained a search warrant for Howell's truck and home. Officers found that during a traffic stop in November 2019, Howell told an officer he had a gun, the officer ran the serial number for the gun, and revealed that the gun was a Hi-Point 9mm. In searching Howell's truck, officers discovered six shell

---

[13] Bernice testified that he had not seen Howell in months and that he could not remember if Howell stopped by his house or not, but that Howell sometimes stopped by Bernice's mother, who lived in Calhoun at that time.

[14] When asked about witnesses seeing him at Sunni's home, Howell only stated that he couldn't remember if he went back to Homer.

casings in the truck bed and a spent silver 9mm shell casing that matched the casing found closest to the victim's body in make, color, and manufacturer. Inv. Monroe testified they searched Howell's home[15] and discovered a bag of ammunition and an empty Hi-Point 9-mm gun box with a serial number that matched the one from the traffic stop, under Howell's bed. Inv. Monroe stated that they never recovered the Hi-Point gun and that Howell told them that the gun was missing, but never reported it stolen.

Doctor Jennifer Forsyth ("Dr. Forsyth"), an expert in forensic pathology, who performed Staples' autopsy, testified that during her examination, she documented two gunshot entrance wounds: (1) underside of the chin and (2) left cheek. Dr. Forsyth testified that Staples' skin on his chin had stipple, which indicated that he was shot at close range, and although she was not certain of the position of the shooter, she could provide that the gunshot wounds were consistent with the gun being under or to the side of the chin facing up. She also stated that she did not see any other apparent injuries and that while some methamphetamine and amphetamine were in Staples' system, deaths due to methamphetamines usually had higher dosages.

Michael Fegely, an expert in geolocation analysis, explained that he used cellphone records as well as cell tower location data from various cell towers throughout the area to compile a cohesive representation of the location of phone numbers and devices presented to him. He explained that information from a cell tower can identify phone transactions in a given area and "tower dumps" can show the location of a cell phone and the pattern of

_____

[15] Inv. Monroe also testified that when they executed the search warrant, Howell had a .380 caliber Glock on him.

7

movement for that device. Fegely testified that he compiled cell data for Staples, Howell, Deason, Flowers, Futch, C. Moon, Miller, and Bell from midnight until 3:00 a.m.

Fegely generally stated that the last outgoing call made from Staples' phone was to Deason at 12:01 a.m., and no further outgoing calls or messages were made; moreover, the phone stayed connected to the same cell tower, indicating that he did not move from that location. Fegely stated that phone records and data from Howell's phone indicated that the last known call occurred at 5:08 p.m. on December 9, and no data activity occurred until 6:53 a.m. He stated he was unable to track Howell's movements from midnight until 3:00 a.m. because the phone was "offline." He then testified that both Deason and Flowers' phones stayed connected to the same cell tower in Ruston from midnight to 3:00 a.m.

Fegely testified that, based on the tower connection, Futch's phone remained in the Homer area and that his number was not found within the "tower dump" where Staples' body was found. Similarly, Fegely testified that Miller's phone number did not appear in the "tower dump." Fegely also stated that C. Moon's phone remained in the Dubach area and Bell's phone remained in the Arcadia area in the specified time frame.

Finally, Michelle Cazes ("Cazes"), of the Louisiana State Police Crime Laboratory and expert in the field of firearms examination and analysis, compared the shell casings and bullets collected from the scene and Staples' autopsy. Cazes determined that the shell casing found at the scene closest to Staples' body and the spent shell casing found in Howell's truck were fired from the same Hi-Point handgun. Cazes also stated she analyzed the two bullets recovered from Staples' body and determined they were also

8

fired from the same Hi-Point 9mm gun. On cross-examination, Cazes stated that Hi-Point guns were common, and acknowledged that there were other casings at the scene not fired from a Hi-Point.

The State also introduced the following pertinent testimony from lay persons:

Futch testified that Staples and Sunni rented a house in Homer that Futch's father owned. He stated that although Staples was a good tenant and they had no personal problems, he evicted Staples because he was three months behind in rent. Futch stated that he did not see Staples on December 9, but was aware that he and Sunni were moving out because Staples texted him earlier to help move furniture. He explained that he did not help and spent the evening with his girlfriend, Rebecca Crain.[16] He stated that he did not know Staples died until the next morning when he went to the hardware store[17] to get locks. Futch then admitted that he knew Kelly, but that he never told him that Staples died. On cross-examination, Futch stated he did not know Howell, and again denied ever contacting Kelly about Staples or a car that Kelly left parked near Staples' home. He later admitted that it was possible he contacted Kelly about a car through Facebook Messenger.

Deason testified that she lived in Ruston when the incident occurred. She stated that on December 9, she was home when Staples called around 5

---

[16] Crain testified that on Dec. 9, she went to Futch's home around 5:00 p.m. She stated that she and Futch went to Staples' home to deliver eviction papers, but no one was home. Crain explained that after they went back to Futch's home, they stayed there the entire night and she was unaware of Staples' death until the next evening.

[17] Daren Wall testified that he was the manager of the M&M hardware store. He stated that Staples was scheduled to work the morning shift, but Staples' mother called and informed him that Staples had been killed. Wall testified that Futch often frequented the store and that he was there that morning. On cross-examination, Wall testified that Futch had told him he talked to Staples the night he died, and agreed that he gave a statement to officers that Futch would keep Staples' rent money.

p.m. or 6 p.m. from a number she did not recognize.  She explained that Staples had been on his way to her house to buy drugs but his vehicle broke down.  Deason stated Staples called her again from Sunni's phone around 10:30 p.m. and explained that he was with Howell.  She stated that Staples called her for the final time around midnight, and by then, Flowers[18] came over and tried to help resolve the issue with Staples' vehicle.

Deason stated Staples was frustrated and she could hear Howell but could not understand what he said.  Deason testified that Staples stated, "Look, just man up.  If you don't feel like driving all the way home, just say so.  If you want to go back to Homer, just say that" and told her, "Look, let me talk to him and figure this out, and either he's going to bring me and drop me off by the road or I'll call y'all back for a ride and help with the car," but Staples never came by her house or called her back.

Next, Miller testified that on December 9, he lived in Minden with Bass[19] and Doyle.[20]  He stated that he did not know Howell, but had known Staples for 12 years and knew that Staples had financial trouble.  Miller admitted that he gave Staples money to pay a loan on a truck; he explained that Staples owed $1,400 dollars on the loan and that he initially gave Staples $1,000 toward the loan and agreed to make the rest of the payment in

---

[18] Flowers testified that during the call, Staples said he was with "Sunni's brother," and that the two could not get the truck started.  Flowers explained that Staples said he would ask Howell for a ride, but heard Staples say, "No, you're not. You don't understand.  You don't understand me," and told Howell to man up before telling them he would call them back, but never did.

[19] Bass testified that she had two cameras on her home, one in the front and one in the back.  She stated that both were motion activated and that although the back camera was charging at one point, Miller was home all night on the night in question.

[20] Doyle testified that she got off work at 10:30 p.m. and went to the store after to get groceries.  She stated that she got back home around 11:00 p.m., and cooked dinner.  She testified that Miller had been home that night and never left.

10

installments. He testified that when he went to pay the last of the loan himself, he discovered Staples had not made any payments and spent the money on something else. Miller admitted he was upset with Staples, and they exchanged words, and he took the truck from Staples to resolve the issue.

Miller testified that he had not spoken to Staples in about two months and that on December 9, he was with his son, helping fix a truck in the Ruston-Choudrant area until about 8:00 p.m. He stated that he went back to Minden but stopped at a truck stop casino, played until about 9:45 p.m., and went home around 10:00 p.m. He stated that Doyle came home around 11:00 p.m., cooked dinner and that he only left the house to move his truck from the front to the back of the home,[21] but stayed home. Miller admitted that he gave his guns[22] to Michael Rockett because he was a convicted felon and knew officers would talk to him because he had Staples' truck. Miller also admitted he threatened several people, including C. Moon,[23] after Staples died, indicating that they would end up on the side of the road. Miller denied killing Staples and stated that he should not have sent those messages and that he only used them as a scare tactic.

Next, White testified that on December 9, he and Kelly pushed Kelly's car to Keith's Food Mart. He stated that he saw Staples there and

---

[21] Trooper Glenn Younger testified that he reviewed the surveillance footage from Bass' home and saw Miller arrive at the home around 10:00 p.m. and that he exited to move a truck toward the back of the home. He testified that he assumed the home had a back door because he could not see any more motion on the camera after Doyle arrived.

[22] Miller testified that he owned a .32 and .22 caliber gun. He also testified that he never owned a Hi-Point gun.

[23] Miller stated he sent that message to C. Moon and Alana Howard, a woman they both dated, and that those messages were sent out of anger.

11

they got oil from a guy who was with Staples. White stated he and Kelly stayed at the gas station after Staples left to fix the car, but stated that the car broke down again near Staples' home. White testified that while they attempted to get the car working, he saw the same man that was with Staples and flagged him down to help. White stated that the man claimed to have dropped Staples off, then went to Staples' home and began to beat on the door and windows, calling out a woman's name. White stated that he stopped paying attention to the man and later he, Kelly, and another friend, Fredrick Champ ("Champ"), went to "Dog's" home where they stayed until the next morning.

R. Moon testified that on December 9, he lived in Lincoln Parish with his fiancée, Nugent,[24] and at that time, did not own a phone or vehicle. R. Moon denied telling Bell he shot Staples because he did not know either Staples or Howell. C. Moon similarly testified that he did not know either Staples or Howell. He stated that he knew Miller and that they both used to date Alana Howard. C. Moon stated that Miller threatened him and told him that he would end up on the side of the road like Staples.

At the conclusion of the State's evidence, counsel for Howell presented the following pertinent testimony:[25]

---

[24] Nugent also testified that she did not know either Staples or Howell.

[25] Mrs. Howell primarily testified that she sent Howell to help Sunni move furniture. She stated that she sent Howell with some of Sunni's things and $60 dollars in an envelope. Mrs. Howell stated that she called Sunni's phone around 10:30 p.m., but Staples answered, and she told Howell to use the money to get gas. She then testified that she did not hear from Howell until the next morning when he woke her up to get his keys. She stated that Howell told her he stopped by Micah Bernice's home before coming home.

Kelly testified that when the incident occurred, he lived in Homer. He testified that on the night in question, he was with White, and later Champ, when his car broke down. He stated that he pushed the car to a gas station and while there, saw Staples and "Steven Howell," who gave them a bottle of oil. Kelly stated the car started, but it broke down near Staples and Lisa Franklin's home. Kelly explained that after unsuccessfully trying to get the car started again, he pushed the car near Staples' home. Later, he, White, and Champ went to "Dog's" home, where he stayed until about 11:00 a.m. Kelly stated that Futch called him around 1:00 a.m. and told him to move the car from Staples' home because it leaked oil. During the call, Futch allegedly told Kelly that Staples was dead; however, on cross-examination, Kelly stated that he was not sure when Futch called him and that the call took place through Facebook Messenger.

At the close of testimony, the jury unanimously found Howell guilty as charged of second degree murder. On November 30, 2021, Howell was sentenced to mandatory life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Howell subsequently filed a motion to reconsider sentence, and the trial court denied the motion on December 29, 2021. Howell now appeals his conviction and sentence.

**DISCUSSION**

*Sufficiency of the Evidence*

By his first and second assignments of error, Howell contends that the evidence presented at trial was purely circumstantial and insufficient to exclude every reasonable hypothesis of innocence that he committed the offense or to support a conviction of second degree murder. Specifically, Howell argues that the State failed to prove beyond a reasonable doubt that

he committed the offense because two other individuals, Miller and R. Moon, claimed responsibility for Staples' death.

Howell further argues that the Hi-Point 9mm gun identified as the murder weapon is relatively common, and although he also owned a Hi-Point 9mm, the gun was either lost or stolen, and the State presented no evidence to establish that this was the same gun used in the commission of this offense. Moreover, Howell asserts that of the two spent shell casings found closest to Staples' body, only one was dispensed from a Hi-Point 9mm, and of the other several casings recovered from the scene, only one matched the casings found in his truck.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797. This standard, now codified in La. C. Cr. P. art. 821, does not afford appellate courts with a means to substitute its own appreciation of the evidence for that of the fact finder. *Steines*, *supra*.

The *Jackson* standard is applicable to cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When

the direct evidence is thus viewed, the facts established by the direct evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983).

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *Broome*, *supra*; *State v. Gipson*, 45,121 (La. App. 2 Cir. 4/14/10), 34 So. 3d 1090, *writ denied*, 10-1019 (La. 11/24/10), 50 So. 3d 827.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/03), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36, 180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 6/27/03), 847 So. 2d 1255.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Elkins*, 48,972

15

(La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 152 So. 3d 438; *State v. Wiltcher*, 41,981 (La. App. 2 Cir. 05/09/07), 956 So. 2d 769. When a defendant challenges both the sufficiency of the evidence, and other trial errors, the reviewing court first reviews sufficiency, as a failure to satisfy the sufficiency standard will moot trial errors. *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 316 So. 3d 1196.

Moreover, in a case where a defendant claims he was not the person who committed the offense, the *Jackson* standard requires that the prosecution negate any reasonable probability of misidentification. *State v. Green*, 38, 335 (La. App. 2 Cir. 5/12/04), 873 So. 2d 889, *writ denied*, 04-1795 (La. 11/24/04), 888 So. 2d 227; *State v. Powell,* 27,959 (La. App. 2 Cir. 4/12/96), 677 So. 2d 1008, *writ denied*, 96-1807 (La. 2/21/97), 688 So. 2d 520.

Here, Howell was convicted of second degree murder in violation of La. R.S. 14:30.1, which is defined, in pertinent part, as "the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm[.]" Specific intent need not be proven as a fact but may be inferred from the circumstances of the transaction and the conduct of the defendant. La. R.S. 14:10(1); *State v. Sanders*, 52,632 (La. App. 2 Cir. 5/22/19), 273 So. 3d 635, *writ denied*, 19-01106 (La. 7/17/20), 298 So. 3d 169. All that is necessary is that the defendant form the specific intent to kill or inflict great bodily harm for an instant when committing the crime. *Id*. Specific intent to kill or inflict great bodily harm may be inferred from the circumstances of the offense, as well as the extent and severity of the victim's injuries. *Id*.

16

In viewing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found beyond a reasonable doubt that the State presented sufficient evidence to prove that Howell committed the offense in question.

In brief, Howell suggests that another individual could have killed Staples, namely, Futch, R. Moon, or Miller; however, cell phone records and data from the cell tower where Staples was killed, do not support this conclusion. Inv. Monroe testified that, based on Staples' last outgoing phone call and when his body was discovered, he died between 12:08 a.m. and 2:42 a.m. Phone records and data were pulled from these individuals, and several others, to confirm their locations and outgoing and incoming phone calls and messages from midnight until 3:00 a.m.

With respect to Futch, Howell highlights that Futch and Staples had a disagreement concerning rent and that Kelly testified that Futch knew about Staples' death approximately two hours before the body was discovered. However, data from the cell tower and Futch's phone records reflected that from midnight until 3:00 a.m., Futch remained in the Homer area, and was not found within the cell tower information dump. Moreover, Futch testified that he was at his residence in Homer during this timeframe and did not know where Staples was that evening. Futch's ex-girlfriend also corroborated that he was home during this time.

Howell also suggests that R. Moon could have killed Staples because he allegedly told Bell that he did so following a drug deal. The record reflects that when the incident occurred, R. Moon's location could not be verified through cell data because R. Moon did not own a phone at that time. However, he testified that when the incident occurred, he lived in Lincoln

Parish with his girlfriend Nugent. He also denied having ever spoken to Bell[26] about Staples because he did not know either Staples or Howell. Moreover, Inv. Monroe testified that the alleged "drug deal" was an anonymous tip to the crime stopper hotline with no further evidence to link R. Moon to the incident.

Howell then suggests Miller could have been responsible because he and Staples had a disagreement concerning payments on Staples' truck and Miller told several people he killed Staples. Although Miller admitted he threatened some people, he clarified that he only intended to intimidate them and denied killing Staples. Importantly, information from the cell tower near the incident confirmed that Miller was not in the area when Staples died, and surveillance from Miller's home in Minden reflected that Miller was home at approximately 10:00 p.m. and did not leave the residence for the remainder of the night. Although the home's back camera was charging, Miller's girlfriend and ex-mother-in-law both confirmed that he never left.

The record, however, does reflect that Howell was the last known person with Staples before he died. Cell phone records and data revealed that Howell's phone died sometime after 9:30 p.m., so his location could not be verified. However, video surveillance from a gas station showed that Staples and Howell were together around 11:00 p.m. and then left together. Testimony from both Deason and Flowers further confirmed that Staples was with Howell from 12:01 a.m. until 12:08 a.m. when Staples called Deason. Both Deason and Flowers testified that Staples and Howell had gotten into an argument, and Deason testified she heard Staples say, "Look,

_____

[26] We further note that Bell was unable to recall ever having a conversation with officers concerning this matter.

18

just man up.  If you don't feel like driving all the way home, just say so.  If you want to go back to Homer, just say that," indicating that the two had an argument.

Cell phone data from Staples' phone and the cell tower revealed that after Staples ended the call with Deason, no subsequent calls or messages were made thereafter, and the phone never left the area, despite Howell's assertion that when he left Staples, Staples had made another phone call. Moreover, evidence from forensic and firearm analysis reports confirmed that the two bullets removed from Staples were fired from a Hi-Point 9mm gun, the exact gun Howell told officers he owned and had in his truck the night Staples died but was now missing.  Evidence further established that the spent shell casing found closest to Staples' body matched another spent casing officers discovered in the back seat of Howell's truck as well as the ammunition later found under Howell's bed in color, make, and manufacturer.

In viewing all of the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that Howell was responsible for Staples' death.  Therefore, this assignment of error is without merit.

*Invocation of Right to Remain Silent and Right to Counsel*

In his final assignment of error, Howell asserts that the trial court erred in admitting statements he made to Inv. Monroe during his third interview.  Howell contends that Inv. Monroe continued to question him after he made an unequivocal request not to speak by shaking his head, and to have counsel present, highlighting the following exchange:

**Q**: . . . Are you willing to answer questions, at this time?

19

**A**: Uh, my lawyer has advised me against that?

**Q**: Okay, so you don't want to answer any questions?

**A**: Uh, I mean– (shakes head right to left).

**Q**: I mean it–it's just a yes or no question. And, like I said, number five says, uh, "If you do decide to start answering questions, you still have the right to stop at any – at any time."

**A**: Okay.

**Q**: So, what–So, you, uh–

**A**: I mean, I–I'll try to answer whatever questions you, got, man.

**Q**: Okay. So that's a yes?

**A**: Yeah, I'll answer your questions until I find–I guess until I find that you're being an–I don't know.

The law regarding the admissibility of confessions is well-settled; before the State may introduce a confession into evidence, it must demonstrate that the statement was free and voluntary and not the product of fear, duress, intimidation, menace, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); *State v. Blank*, 04-0204 (La. 4/11/07), 955 So. 2d 90. The State must also show that law enforcement officers advised the defendant of his *Miranda* rights and that he knowingly waived those rights. *State v. Moseley*, 587 So. 2d 46 (La. App. 2 Cir. 1991), *writ denied*, 589 So. 2d 1066 (La. 1991), *citing Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

However, even after waiving his Miranda rights, a defendant may invoke such rights at any time prior to or during questioning. *State v. Leger*, 05-011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed. 2d 100 (2007); *State v. Wilson*, 50,865 (La. App. 2 Cir.

11/16/16), 208 So. 3d 999, *writ not cons.*, 17-0217 (La. 4/24/17), 219 So. 3d 329. Although *Miranda* does not require that a defendant exercise his right to remain silent by any particular phrasing, a defendant's invocation of his right to remain silent, just as a request for counsel, must be clear and unambiguous. *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), *citing Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

In the case *sub judice*, testimony confirms that Inv. Monroe read Howell his *Miranda* rights and Howell indicated that he understood those rights by executing a written waiver of rights form. However, Howell argues that his confession should have been suppressed because he invoked his 5th Amendment right to remain silent when he indicated he did not want to answer questions by shaking his head and all questioning thereafter should have ceased. We disagree.

Here, the transcript of Howell's third interview reflects that in response to Inv. Monroe's inquiry of whether Howell wanted to answer any questions, Howell's response was "Uh, I mean-" and he shook his head from right to left; video recording of the interview reflects that Howell made a barely audible comment and slightly moved his head. Given that an invocation for the right to remain silent *must* be express and unambiguous, we cannot say that Howell's response was a specific invocation of his right to remain silent.

Moreover, we note that after Inv. Monroe stated "I mean it—it's just a yes or no question. And, like I said, number five says, uh, 'If you do decide to start answering questions, you still have the right to stop at any – at any time,' " Howell continued to speak, stating, "I mean, I – I'll try to answer

21

whatever questions you, got, man." Because Howell did not invoke his right to remain silent prior to or during questioning, we find that it was permissible for investigators to continue the interview.

Howell further contends that his statements should not have been admissible because he invoked his right to counsel, which should have ceased the interview. We disagree.

The inquiry in cases where the defendant claims he invoked his right to counsel is whether the statement was clear and unambiguous under the circumstances so as to put a reasonable police officer on notice that defendant was invoking his right to counsel during a custodial interrogation. *State v. Payne*, 01-3196 (La. 12/4/02), 833 So. 2d 927. In *Davis v. U.S.*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), the Supreme Court declared that an equivocal or ambiguous statement, such as "maybe I should talk to a lawyer," was insufficient to constitute an invocation of the *Miranda* right to counsel, and that an unambiguous, clear assertion of the right was necessary to trigger the rule that interrogation cease upon invocation of the right.

After being advised of his rights and asked if he wanted to answer questions, Howell stated that his lawyer advised him against that. At no point during the exchange did Howell specifically request that he wanted his attorney present or that he did not want to speak until his attorney was present. Rather, Howell merely mentioned that at one point, his attorney advised him not to answer questions. Moreover, during the evidentiary hearing, Howell admitted that he never specifically asked for or requested counsel during the interview. Under the bright-line rule established in

22

*Davis*, *supra*, Howell's passive comment of his attorney's advice is insufficient to invoke his right to counsel.

Accordingly, we find that Howell failed to show that he invoked his right to silence or counsel in a clear manner such that a reasonable police officer in the circumstances would have understood the statement to be an unequivocal request for an attorney and that custodial interrogation was to be terminated. Therefore, we find that the trial court did not err in admitting the statement and thus, this assignment of error is without merit.

## CONCLUSION

For the reasons stated above, Howell's conviction and sentence are affirmed.

**AFFIRMED.**